E-FILED
Monday, 11 November, 2024 PM
Clerk, U.S. District Court, ILCD

EXHIBIT
A

**Page 1**

```
 1
 2            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
 3  LUCAS WOOD,                  )
                                 )
 4                 Plaintiff,    )
                                 )
 5        VS.                    )  No. 21-CV-2254
                                 )
 6  DR. JONATHAN EK, WEXFORD     )
    HEALTH SOURCES, INC.,        )
 7  JENNIFER CHICONE, CARLE      )
    PHYSICAL THERAPY, JOHN       )
 8  CURTIS, AND UNKNOWN EMPLOYEES)
    OF WEXFORD,                  )
 9                               )
                   Defendants.   )
10
11
12
13
14
15           DEPOSITION OF LUCAS WOOD
                 APPEARING REMOTELY
16                 APRIL 9, 2024
                    10:00 a.m.
17
18
19
20
21  REPORTED BY:
    LORRAINE MCCREIGHT
22  CSR NO. 084-003070
    APPEARING REMOTELY FROM PEORIA COUNTY, ILLINOIS
23
24
```

**Page 3**

```
                      INDEX
 1
 2  WITNESS                              PAGE
 3  LUCAS WOOD
 4     Examination By Ms. Syrcle ..................4
       Cross By Mr. Watkiss .......................81
 5     Redirect By Ms. Syrcle ....................104
 6
 7             E X H I B I T S
                                   MARKED
 8  NUMBER                         FOR ID
 9  Deposition Exhibit
10     No. 1 ......................        26
11     No. 2 ......................        69
12     No. 3 ......................        71
13
14
```

**Page 2**

```
 1  PRESENT:
 2                  JOY C. SYRCLE, ESQ.
                    CASSIDAY SCHADE LLP
 3                  2040 West Iles Avenue
                    Suite B
 4                  Springfield, IL  62704
                    jsyrcle@cassiday.com
 5                  for Defendants Wexford Health
                    Sources, Inc., Dr. Jonathan
 6                  Ek, Kitwana Grant & Alicia
                    Pearson;
 7
 8                  PAUL WATKISS, ESQ.
                    ASSISTANT ATTORNEY GENERAL
 9                  115 S. LaSalle Street
                    Suite 2800
10                  Chicago, IL  60603
                    Paul.watkiss@ilag.gov
11                  for Defendant Jennifer
                    Chicone.
12
```

**Page 4**

```
 1
 2                   LUCAS WOOD
 3            being first duly sworn,
 4           was examined and testified
 5                  as follows:
 6             DIRECT EXAMINATION
 7  BY MS. SYRCLE:
 8     Q.   Good morning, Mr. Wood.
 9          Would you please state and spell your
10  name for the record?
11     A.   Lucas Wood, L-U-C-A-S, W-O-O-D.
12     Q.   I introduced myself before we went on the
13  record, but I am Joy Syrcle.  I am counsel for
14  Wexford, Dr. Ek, Kitwana Grant and Alicia
15  Pearson.
16          Have you ever been deposed before?
17     A.   No.
18     Q.   I'm going to go over just a couple sort
19  of general background rules how this process
20  works.  So, this is our opportunity to ask
21  questions.  You can see that we have a court
22  reporter who's taking down everything that we
23  say, so it's really important that we not talk
24  over each other, especially given that we are
```

5

1    appearing via Zoom today so we are not present in
2    the room together.  So, I will do my best to let
3    you finish answering a question before I start to
4    ask the next question, and I would ask that you
5    let me finish asking a question before you start
6    to answer.
7            Does that make sense?
8    A.    Yes.
9    Q.    It's also really important that you
10   answer verbally because the transcript won't
11   accurately reflect things like a head shake or
12   nod or uh-huh, huh-uh type answers.
13           Does that make sense?
14   A.    Yes.
15   Q.    And you understand that you are placed
16   under oath.  You were just sworn in.
17   A.    Yes.
18   Q.    So, anything that you say today will have
19   the same force and effect as if you were in a
20   court of law.
21           Do you understand that?
22   A.    Yes.
23   Q.    If you don't understand a question that I
24   ask, please ask me to rephrase it, let me know

7

1    medication.
2    Q.    Okay.  And neither of those would, you
3    know, interfere with your cognition or memory in
4    any way, right?
5    A.    Nope.  I'm ready.
6    Q.    No drugs or alcohol, right?
7    A.    Yeah.
8    Q.    I'm going to ask just a little bit of
9    background about you -- well, first let me ask,
10   you are -- you are testifying today from East
11   Moline Correctional Center, is that correct?
12   A.    Correct.
13   Q.    The allegations in your Complaint take
14   place at Danville, correct?
15   A.    Correct.
16   Q.    Did you do anything to prepare for your
17   deposition today?
18   A.    Yes.
19   Q.    What did you do?
20   A.    I read about being deposed.
21   Q.    Okay.  So, did you find some sort of
22   reference material from the law library?
23   A.    I have many legal books since I started
24   this case.

6

1    that you don't understand what I am asking.  If
2    you answer, I will assume that you understood the
3    question.  And I won't be offended by any means
4    if you ask me to rephrase because we want a good
5    transcript at the end.
6            If you need to take a break at any point,
7    I don't know what the process is on your end of
8    things, but I am happy to take a break as long as
9    there is not a question pending.  You know, if
10   you need a few minutes, if you need a restroom
11   break or a drink or something, just let me know.
12   And if there's a question pending I would just
13   ask that you answer that question before we go
14   off the record.
15           Are you aware of any reason such as
16   medication or something like that that you
17   would -- it would prevent you from being able to
18   testify truthfully here today?
19   A.    No.
20   Q.    Have you taken any medications this
21   morning?
22   A.    Yep.
23   Q.    What medications have you taken?
24   A.    Lisinopril and my blood pressure

8

1    Q.    Okay.  So, it was -- you said read about
2    being deposed.  Is it just general information
3    about depositions?
4    A.    And tips, I guess you could say.
5    Q.    Okay.  Strategies as a witness?
6    A.    Not so much that.  More of, you know,
7    take your time before answering, and you know, if
8    you don't know, say you don't know because it's
9    on the record.
10   Q.    Okay.  Good advice.
11           Were any of the materials that you
12   reviewed regarding depositions, were any of
13   them -- nothing was specific to this case, right?
14   A.    No.
15   Q.    Did you review any materials specific to
16   this case?
17   A.    I know this case like the back of my
18   hand.
19   Q.    Do you have any materials there with you
20   today?
21   A.    I have everything here with me today.
22   Q.    When you say everything, can you tell me
23   what you have?
24   A.    My Complaint and all my exhibits and my

9

1    notebook with notes.
2        Q.    Okay.  So, you said your Complaint and
3    your exhibits.  In this case you have the
4    original Complaint and the Amended Complaint, is
5    that right?
6        A.    Yes.
7        Q.    Are those the only two Complaints that
8    you have in front of you?
9        A.    I only have my Amended Complaint.
10       Q.    Okay.  You said the exhibits to the
11   Complaint.  Is that limited to things that you
12   actually filed with the Court with your
13   Complaint?
14       A.    I believe it's everything that you have.
15   I mean, I think I have 21 exhibits.
16       Q.    Okay.  Let me --
17           MR. WATKISS:   Joy, that's docket
18   number 24 in the suit where all of those exhibits
19   are located.
20   BY MS. SYRCLE:
21       Q.    Is that correct, Mr. Wood?
22           That's what I was just pulling up.  Is
23   docket number 24?
24       A.    It might be.  I don't know the docket

10

1    number but I know I sent it all in initial
2    disclosures.
3        Q.    There is a cover sheet that lists 21
4    exhibits, is that right?
5        A.    Yes.
6        Q.    And that's the document that you are
7    referring to in front of you?
8        A.    Yeah.
9        Q.    Okay.  You said you have a notebook with
10   notes.  Can you describe what that is?
11       A.    (Indicating.)
12       Q.    Are those notes that you took
13   contemporaneously with events or like as things
14   were happening?
15       A.    Yes.  Drafts to all of my motions that I
16   typed and notes I have taken about other people's
17   summary judgments that I have been doing.
18       Q.    Okay.  Have those been produced to us?
19       A.    No.
20       Q.    Are there details about this case in that
21   notebook?
22       A.    No.  Well, I mean there's details about
23   this case in here, yeah, but other cases as well.
24       Q.    When you say drafts of your motion, are

11

1    you referring to motions that were filed in this
2    case?
3        A.    Yes.
4        Q.    Are there other notes reflecting events
5    as they were occurring?
6        A.    From like 2021 when this case -- like
7    when I hurt myself?
8        Q.    Correct.
9        A.    No.
10       Q.    What is the first -- the date of the
11   first entry in that notebook?
12       A.    November 2023.
13       Q.    Anything else that's in front of you
14   there today?
15       A.    I mean, I have a whole legal binder, but
16   a lot of it's other legal cases.
17       Q.    Okay.  So, those are -- are there
18   materials related to this case in here --
19       A.    Yeah.
20       Q.    -- in there?
21       A.    Yes.
22       Q.    Are they all materials that have been
23   filed with the Court or provided in discovery?
24       A.    No.  But I did make copies of them today

12

1    and I plan to send them to you today.
2        Q.    Okay.  Can you describe for me what those
3    documents are?
4        A.    I have Defendant X Final Order of
5    Suspension alleging or finding him guilty of the
6    substance abuse, the sexual misconduct, and other
7    things.  I have a Declaration.  I have a Freedom
8    of Information Act on Defendant Jennifer Chicone
9    and her job responsibilities and the amount of
10   time she's supposed to be spending on them.  And
11   I believe I have some of the Lippert report about
12   Wexford being made aware that they were
13   deliberate and indifferent to IDOC inmates.
14       Q.    Referring to X Suspension, that is
15   referencing something that happened in Oklahoma
16   more than a decade ago, is that right?
17       A.    Yes.
18       Q.    You said a Declaration.  Who is the
19   Declaration from?
20       A.    Her name is Jamie Peatree.
21       Q.    What is the substance of the Declaration?
22       A.    That she was aware that I was in pain and
23   that she was talking to me daily and trying to
24   get me help at Danville.

13

1    Q.    Who is Jamie Peatree?

2    A.    A friend.

3    Q.    Okay.  So, she is somebody who was

4  outside the Department of Corrections?

5    A.    Yes.

6    Q.    And you said a Freedom of Information Act

7  about Chicone.  Is that you submitted a FOIA

8  request to the Department of Corrections?

9    A.    Yes.

10    Q.    Okay.  And you have what they responded,

11  is that right?

12    A.    Yes.

13    Q.    Okay.  And those are all things that you

14  are producing to us today?

15    A.    Yes.

16    Q.    Did you -- you referenced the Complaint

17  and the Amended Complaint.  Did you write those

18  yourself?

19    A.    Yes.

20    Q.    Did you have assistance from any inmate

21  or anybody outside the Department to prepare

22  those?

23    A.    I did get some assistance, yes.

24    Q.    Who did you get assistance from?

14

1    A.    A guy that helped me when I was becoming

2  a paralegal.

3    Q.    Who was that?

4    A.    His name is Daniel Mackel.

5    Q.    Is he an inmate?

6    A.    Yes.

7    Q.    Is he in Danville, or was he at the time?

8    A.    Yes, he is.

9    Q.    Are you currently -- did you complete the

10  process to become a paralegal?

11    A.    I am a Certified Legal Assistant, yeah.

12    Q.    And how long ago did you do that?

13    A.    About a year ago.

14    Q.    And you have been certified ever since?

15    A.    Yes.

16    Q.    How long was that process?

17    A.    About two years.

18    Q.    Did you do that like a correspondence

19  course or did somebody come to the facility?

20    A.    Correspondence through Blackstone Career

21  Institute.  It's an accredited school in

22  Pennsylvania, I think.

23    Q.    Okay.  Did you speak with anybody to

24  prepare for your deposition today?

15

1    A.    No.

2    Q.    Okay.  I'm going to -- now I'll ask some

3  just general background questions about you.

4  Where were you born?

5    A.    Elgin, Illinois.

6    Q.    And what was your date of birth?

7    A.    July 5th, 1989.

8    Q.    Did you live in the Elgin area from the

9  time you with born until at least until the time

10  you were incarcerated?

11    A.    Majority of it but not all of it.

12    Q.    Where else did you live?

13    A.    DeKalb, Illinois.

14    Q.    Was your current incarceration out of

15  DeKalb County?

16    A.    Yes.

17    Q.    Were you living in DeKalb when you were

18  incarcerated for this day in IDOC?

19    A.    Yes.

20    Q.    Do you have family in central Illinois?

21  When I say central Illinois I'm referring to

22  Springfield, Danville, Peoria, that sort of

23  swath?

24    A.    No.  My wife lives in the Quad Cities.

16

1    Q.    What's your wife's name?

2    A.    Sarah Wood.

3    Q.    How long have you been married?

4    A.    Almost a year.

5    Q.    You were incarcerated when you married?

6    A.    Yes.

7    Q.    What was her maiden name?

8    A.    Duncan.

9    Q.    You said she lives in the Quad Cities?

10    A.    Yes.

11    Q.    Where in the Quad Cities?

12    A.    LeClaire, Iowa.

13    Q.    Were you married before?

14    A.    No.

15    Q.    Any children?

16    A.    Yes.

17    Q.    How many children?

18    A.    I have one daughter.

19    Q.    What's her name?

20    A.    Brooklyn.

21    Q.    How old is she?

22    A.    Thirteen.

23    Q.    And where does she live?

24    A.    DeKalb.

17

1    Q.    Did her mother also live in DeKalb?
2    A.    Yes.
3    Q.    What's her mother's name?
4    A.    Tiffany.
5    Q.    Last name?
6    A.    Gladson.
7    Q.    Is your daughter's last name Wood?
8    A.    Yes.
9    Q.    Do you go by any nicknames or aliases?
10   A.    Luke.
11   Q.    Okay.  That's it?  Anything else?
12   A.    Nope.
13   Q.    If the guys see you on the yard do they
14   call you Luke?
15   A.    Yep.
16   Q.    We talked about a little bit about your
17   paralegal certificate.  Did you graduate from
18   high school?
19   A.    I have a G.E.D.
20   Q.    When did you get the G.E.D.?
21   A.    I want to say -- don't quote me, but
22   around 2006.
23   Q.    Okay.  Were you out in the community when
24   you got the G.E.D. or were you incarcerated at

18

1    the time?
2    A.    I was home, and I got it from Kishwaukee
3    College.
4    Q.    So, the G.E.D., paralegal certificate,
5    any other college type courses or community
6    college courses?
7    A.    I'm a licensed barber, and I am in a
8    college program right now getting a bachelor's
9    degree in communications through Augustana.
10   Q.    Okay.  How long have you been a licensed
11   barber?
12   A.    Almost ten years.
13   Q.    Did you work as a barber in the
14   community?
15   A.    I did.  I owned a barbershop.
16   Q.    Have you worked at all as a barber while
17   being in the Department of Corrections?
18   A.    Not during this incarceration, no.  I'm a
19   full-time student.
20   Q.    Okay.  How long have you been working on
21   the communications degree?
22   A.    I'm finishing up my sophomore year now.
23   So, two years.
24   Q.    Okay.  Good for you.  Any other training,

19

1    vocational training or anything like that?
2    A.    No.
3    Q.    Any medical training?
4    A.    No.
5    Q.    You are currently incarcerated for a --
6    currently incarcerated on a charge of domestic
7    battery, is that correct?
8    A.    Correct.
9    Q.    And you have been in the Department of
10   Corrections since 2020, is that correct --
11   A.    Yes.
12   Q.    -- during this stay?
13         In custody since December of 2019,
14   correct?
15   A.    Correct.
16   Q.    And it shows a projected parole date of
17   2026.  Is that accurate?
18   A.    Yep.
19   Q.    And it looks like you have had prior
20   incarcerations, the first being in 2007, correct?
21   A.    Correct.
22   Q.    Burglary, criminal damage to property,
23   was that the first incarceration?
24   A.    Yes.  I was a teenager.

20

1    Q.    Okay.  It looks like in 2011 you were
2    incarcerated for aggravated battery of a pregnant
3    person, is that correct?
4    A.    Yep.
5    Q.    And then there's a custody date of 2012.
6    Was that all part of the 2011 incarceration or
7    were those two separate stays?
8    A.    Two separate stays.
9    Q.    Okay.  So, in 2012 there's a charge for
10   aggravated domestic battery, it looks like
11   strangle, is that correct?
12   A.    Yeah.
13   Q.    And then in 2019 there was a separate
14   incarceration for aggravated battery of a police
15   officer, is that correct?
16   A.    Correct.
17   Q.    Does that cover all of your felony
18   incarcerations?
19   A.    Home invasion.  That's what I'm actually
20   here for now.  I served the time for the
21   domestic.
22   Q.    I see that, that there were two charges
23   on this incarceration, is that right?
24   A.    Yes.

21

1    Q.    Okay.
2    A.    Three.
3    Q.    Does that cover all of your felony
4    incarcerations?
5    A.    Yes.
6    Q.    Have you ever been convicted of a crime
7    involving dishonesty like forgery, fraud,
8    anything like that?
9    A.    No.
10    Q.    While in the Department of Corrections
11    have you been disciplined?
12    A.    I mean, yes.
13    Q.    Were any of the -- was any of the
14    discipline for an offense of dishonesty like
15    giving false information to an officer?
16    A.    Yes.
17    Q.    When was that?
18    A.    I think it was around 2021.  But I wasn't
19    dishonest but I did get a ticket for providing
20    false information.  It wasn't false, but I'm at
21    their whim.
22    Q.    Okay.  And you were actually disciplined
23    for that, is that right?
24    A.    Yes.

22

1    Q.    Okay.  What were the circumstances
2    surrounding that?
3    A.    I was at work on my day off covering for
4    one of my coworkers, and when he came back to
5    work I left.  And when the person who strip
6    searched me out of work asked where I was going I
7    told him that I had a call pass, which was true.
8    And then when I got back to my unit the officer
9    asked me why I was back so early.  I told her it
10    was my day off, which is also true.  But when
11    they talked, since I told them both different
12    things, they wrote me a ticket for providing
13    false information.
14    Q.    Okay.  So, you actually had a call pass
15    and you left because you were going to go -- was
16    the call pass for healthcare?
17    A.    No, it was to become a peer mentor.  I
18    was trying to become a peer mentor.
19    Q.    Okay.  And then you were actually going
20    to wherever you needed to go for that call pass?
21    A.    Yes.
22    Q.    When approximately was that in 2021, do
23    you recall?
24    A.    I don't.

23

1    Q.    Okay.  Any other infractions related to
2    giving false information to an officer?
3    A.    No.
4    Q.    So, I know you are in East Moline now,
5    but I want to talk about Danville because the
6    claim arises out of Danville.
7         Were you employed -- I think what you
8    just described was something related to a job
9    while you were at Danville, is that right?
10    A.    Correct.
11    Q.    Where did you work at Danville?
12    A.    Officer's commissary.
13    Q.    How long did you hold that job?
14    A.    About two, three weeks.
15    Q.    Okay.  Did you lose the job in relation
16    to that discipline?
17    A.    I did.
18    Q.    So, do you remember when, you know, the
19    time frame in which you held that job?
20    A.    I do not.
21    Q.    Like the month?
22    A.    I do not.
23    Q.    I thought I had something with it on
24    there but I have closed it.

24

1         Do you remember if it was early in the
2    year in 2021 or later in the year?
3    A.    I would guess around June, July, because
4    shortly after that I transferred to East Moline.
5    Q.    Okay.  So, let's back up.
6         You said 2021, right, that you held the
7    job in the Officer's commissary?
8    A.    It was 2021 or 2022.  I don't know.  It's
9    all --
10    Q.    Okay.
11    A.    Do you know what year I got to East
12    Moline?
13    Q.    Well, you didn't transfer to East Moline
14    until 2022 according to our record.
15    A.    All right.  So, it was 2022.
16    Q.    So, you held the job in the Officer's
17    commissary just before the transfer to East
18    Moline?
19    A.    Correct.
20    Q.    And would that then be the time frame
21    that you got the discipline that you were
22    referring to?
23    A.    Yes.
24    Q.    Okay.  Any other jobs while you were at

25

1   Danville?
2        A.    No.
3        Q.    So, what was a typical day like for you
4   in Danville?
5        A.    I mean, you are pretty much in your room
6   all day.
7        Q.    Did you have yard?
8        A.    Yeah.
9        Q.    Did you go to yard when it was offered?
10       A.    Sometimes.
11       Q.    Why just sometimes?
12       A.    I mean, sometimes you just want the room
13  to yourself, you know.  I mean, you get -- you
14  know, you are with somebody in a room 24 hours a
15  day, you just want some you time.
16       Q.    Okay.  How often, you know, 2021, how
17  often in 2021 do you think that you chose to stay
18  in the room instead of go to yard?
19       A.    I went to yard more than I didn't.  But
20  in 2021 I think I was in -- prior to the incident
21  I probably went out more.
22       Q.    Okay.  Let's talk about -- so, the
23  allegations in this case happened in -- the
24  injury that you are alleging happened in July of

26

1   2021, right?
2        A.    Correct.
3        Q.    Okay.  So, in -- were you -- did you hold
4   a job at all in July of 2021?
5        A.    No.
6        Q.    I'm going to mark as an exhibit a
7   document that was produced in this case.  It is
8   your Trust Fund Ledger.  I'm going to share my
9   screen.
10            This will be Exhibit 1.
11
12                         (Whereupon Deposition
13                         Exhibit No. 1 was marked
14                         for identification.)
15
16  BY MS. SYRCLE:
17       Q.    Can you see a document on the screen?
18       A.    Yes.
19       Q.    That's Danville Correctional Center Trust
20  Fund Inmate Transaction Statement.
21            Do you see that?
22       A.    Yes.
23       Q.    In references -- this is Wood, Lucas, and
24  this is your IDOC number, is that right, up here

27

1   in the corner?
2        A.    Yes.
3        Q.    Is this familiar to you from discovery in
4   this case?
5        A.    Did I have to send this when I filed the
6   in forma pauperis?
7        Q.    So, this was actually exchanged -- down
8   here it's got an IDOC Bates number.  And the
9   Bates number is the consecutive numbering for
10  documents produced in discovery.  And I will
11  represent to you that this was produced in
12  discovery by counsel for Miss Chicone.
13       A.    Okay.
14       Q.    Does this -- but do you remember seeing
15  this document either in discovery or if you have
16  ever -- let me ask this.
17            Have you ever asked for a copy of your
18  Trust Fund Ledger?
19       A.    I had to when I filed in forma pauperis.
20       Q.    So, you have seen a document like this.
21       A.    Yes.
22       Q.    And if I scrolled down and we look at the
23  month of July of 2021, there's a reference to
24  payroll and payroll adjustment.  Payroll for

28

1   month of June of 2021?
2        A.    Uh-huh.
3        Q.    If we scroll down there is payroll
4   adjustment on August 12 of 2021, payroll month of
5   July of 2021.  Do you see those?
6        A.    I do.
7        Q.    Do you know what you are receiving money
8   for on a payroll?
9        A.    I do.  Every inmate in IDOC gets a state
10  pay because they don't provide us soap or hygiene
11  and we are made to buy ourselves -- you don't
12  need to have a job or be in school.  Every inmate
13  gets state pay.
14       Q.    So, this payroll is referring only to
15  state pay and not for anything that you were
16  doing at Danville, is that right?
17       A.    Correct.
18       Q.    Okay.  So, prior to July of 2021, your
19  typical day, you had yard.  How often did you
20  have yard?
21       A.    Five times a week, four times a week.
22       Q.    And how long would yard be?
23       A.    An hour.
24       Q.    When you say five times, would it be like

29

1  one hour a day for five days?
2      A.    Yeah.
3      Q.    And you went more often than not you
4  said, is that right?
5      A.    Correct.
6      Q.    How about gym, did you have a gym?
7      A.    Yes.
8      Q.    How often would you go to gym?
9      A.    Less than I would go to yard.
10     Q.    Was it offered at different times?
11     A.    You would get typically one or the other
12  almost every day.
13     Q.    Okay.  What kinds of things, what kinds
14  of activities did you do on the yard?
15     A.    Prior to July of 2021?
16     Q.    Yes.
17     A.    I liked to play soccer.  I liked to play
18  basketball.  I lift weights.
19     Q.    Okay.  What kind of weights?
20     A.    Free weights.
21     Q.    What type of weightlifting?  Like what
22  type?  I mean, did you do squats, deadlifts,
23  curls?  Like shoulder presses?  I mean, all of
24  the -- chest press?  Like all of the above?

30

1      A.    All of the above.
2      Q.    Okay.  Anything else on yard?
3      A.    Horseshoes.
4      Q.    Okay.  How about the gym, what kinds of
5  activities in the gym?
6      A.    Weight lift.
7      Q.    Same type of lifting?
8      A.    Yes.
9      Q.    So, did you have any classes or groups or
10  anything like that that you attended --
11     A.    No.
12     Q.    -- the time frame prior to July of 2021?
13     A.    No.
14     Q.    Anything else that you did to pass the
15  time outside your cell in July, prior to July of
16  2021?
17     A.    No.
18     Q.    Where were you housed in July of 2021?
19     A.    Three House.
20     Q.    And were you first level, second level?
21  Do you recall?
22     A.    Second level.
23     Q.    You had a low bunk permit, right?
24     A.    Correct.

31

1      Q.    And the low bunk permit was for seizures,
2  is that right?
3      A.    Correct.
4      Q.    So, I assume you had a low bunk, right?
5      A.    Yes.
6      Q.    How far was Three House from like Chow
7  Hall?
8      A.    Probably a little less than a quarter
9  mile, but it's a good hike.
10     Q.    Okay.  So, I have been to Danville.  How
11  many -- so, Three House, how many buildings are
12  in between.  Because I know it's laid out in
13  multiple buildings sort of with a quad sort of
14  area in the middle, right?
15     A.    Well, you have the Chow Hall in the
16  right, and to the left of that is One House, then
17  Two House, then Three House, then the yard and
18  Four House.
19     Q.    And then does it wrap back around to
20  where like Healthcare is over here to the right
21  then?
22     A.    That's right where you come in if you
23  were coming in, it's that building just farther
24  down in that Administration Building.

32

1      Q.    Okay.  So, just to clarify the Chow Hall
2  and the Healthcare Unit are in the same building,
3  just further down?
4      A.    No.  The Healthcare is in the same
5  building as the Administration Building where you
6  would walk in.
7      Q.    And Chow Hall is on the other side --
8      A.    Yeah.
9      Q.    -- of the open space in the middle?
10     A.    In Healthcare to Three House is probably
11  about a quarter mile.
12     Q.    Okay.  And prior to July of 2021 how
13  often did you go to chow?
14     A.    Every day.
15     Q.    Was it three meals a day at Chow Hall or
16  were any meals in your housing unit?
17     A.    No.
18     Q.    So, did you go to three meals a day?
19     A.    I would go to lunch and dinner.
20     Q.    How about commissary, where is commissary
21  located?
22     A.    That's the same building as the Chow
23  Hall, just a little farther away.
24     Q.    And prior to July of 2021 did you go to

33

1    commissary?

2    A.    Yeah.

3    Q.    How often did you get to go to

4    commissary?

5    A.    Once every three to five weeks.

6    Q.    What is the process? I mean, do you -- I

7    have heard of guys saying they would take like a

8    pillow case or something and put the stuff from

9    commissary in to bring back. Do you have a

10    process like that for how you got stuff back?

11    A.    I have a big mesh laundry bag that I walk

12    over there and grab my stuff and bring it back.

13    Q.    Okay. And did you go to commissary

14    pretty much any time it was offered?

15    A.    Yes.

16    Q.    So, let's talk about then after July 11

17    of 2021. How often were you -- so, you were in

18    the Infirmary beginning in September of 2021,

19    right?

20    A.    Sounds right.

21    Q.    So, in the time period between July 11

22    and September, I believe it's September 3rd of

23    2021, during that time period how often were you

24    going to yard?

34

1    A.    I couldn't.

2    Q.    So, you couldn't go to yard at all after

3    the injury from January -- excuse me, from

4    July 11, 2021?

5    A.    I went a few times, I would hobble out

6    there, but I usually had to have like someone

7    help me.

8    Q.    How about commissary, were you able to go

9    to commissary?

10    A.    I went but it hurt.

11    Q.    Were you able to continue going to Chow

12    Hall?

13    A.    I went when I had to.

14    Q.    What do you mean by when you had to?

15    A.    I can't -- you know, if I didn't have

16    food in my box to eat.

17    Q.    By in your box, do you mean from

18    commissary?

19    A.    Yes.

20    Q.    Anything else? Did you go to gym during

21    that time period from the July 11 to

22    September 3rd, 2021?

23    A.    I don't think so. I usually just went to

24    yard because I could sit out there, you know, and

35

1    get fresh air. But I would have to walk to the

2    shower every day. I'd have to walk up and down

3    the stairs to get to the phone every day.

4    Q.    Were you in a program called the Wellness

5    Group?

6    A.    No.

7    Q.    You didn't ever attend a program in the

8    yard called the Wellness Group?

9    A.    That does not ring a bell, no.

10    Q.    Do you ever remember participating in a

11    group exercise program on the yard?

12    A.    I remember signing up for one.

13    Q.    And it's your testimony you didn't

14    actually participate in it?

15    A.    No.

16    Q.    Did you -- actually, I'll hold that.

17    Have you filed any other lawsuits related

18    to any personal injury or civil rights cases

19    related to your incarceration?

20    A.    No.

21    Q.    Can you explain to me the process at

22    Danville for getting medical care?

23    A.    How it is or how it's supposed to be?

24    Q.    What was the process? Like what -- let

36

1    me ask you this.

2    Did you get -- when you transferred into

3    Danville, did you get an inmate handbook?

4    A.    Yes.

5    Q.    Did it have a section in it on this is

6    the process for the instructions to you on how to

7    get medical care?

8    A.    Yes.

9    Q.    What is the process that's set up?

10    A.    I would write a request slip requesting

11    to go to nurse sick call, and they are supposed

12    to triage it and see you the next day.

13    Q.    Okay. You say they are supposed to

14    triage it. What do you mean by triage it?

15    A.    By the level of importance I'm assuming.

16    I'm not 100 percent sure. I know in the Lippert

17    stuff that I either sent you or am sending you it

18    talks about it.

19    Q.    So, you think that the nurses have a

20    process where they review the requests that you

21    send and triage as to whether or not you need to

22    be seen?

23    A.    In level of importance, I believe.

24    Q.    And that's based on something that you

37

1  think you read in the Lippert report?
2    A.    Yes.
3    Q.    So, you submit the sick call slip. What
4  is -- is there a form in your housing unit? What
5  is it that you submit?
6    A.    It's called a request slip. It's just to
7  and from and what you want. You can do it on a
8  normal piece of paper if you don't have one.
9    Q.    Okay. And where do you submit it?
10   A.    To the institutional mailbox.
11   Q.    Okay. So, there's -- is that separate
12 from -- is there like a grievance box and a
13 mailbox that are separate?
14   A.    Yes.
15   Q.    And so it's the box with a slit in the
16 top that you slip your request in the top, is
17 that right?
18   A.    Correct.
19   Q.    Is that located in your housing unit?
20   A.    In the foyer of the housing unit, yes.
21   Q.    Okay. So, you have access to that on --
22 any day that you want to submit you have access
23 to submit something into that box, is that right?
24   A.    Yes.

38

1    Q.    Do you keep a copy of any of the sick
2  call slips that you submit?
3    A.    I don't have access to make copies.
4    Q.    Okay. What happens then -- so, you
5  believe that the nurses triage and determine the
6  degree of importance.
7         Do you get -- you get a call pass, right,
8  to come over?
9    A.    Yes.
10   Q.    Is that how you are notified that you are
11 signed up for sick call?
12   A.    Yes.
13   Q.    And how do you get that notification?
14 How do you get that call pass?
15   A.    They pass out call passes every evening.
16   Q.    So, you would get it for the next day?
17   A.    Yes.
18   Q.    And what is the process then? Does the
19 call pass tell you what time?
20   A.    Yes.
21   Q.    And what is the process for you getting
22 to go to Healthcare?
23   A.    They see that I have a call pass at a
24 certain time. They will, you know, say 1:00 call

39

1  passes. And if you have one you hit your button
2  and that will unlock your door.
3    Q.    Okay. And then you walk over to the
4  Healthcare Unit and wait to be seen?
5    A.    Correct.
6    Q.    Okay. Is there a different process if
7  you have an emergency?
8    A.    You could talk to the police, but I tried
9  that. I talked to the Warden. I had my family
10 calling. I wrote grievances. I don't know how
11 much else I could have tried.
12   Q.    Is there a process that's called a Code
13 3?
14   A.    I mean, I don't know the codes, but I
15 know like medical emergency, like if you have a
16 heart attack or something.
17   Q.    Do you know what the process is for
18 calling a code?
19   A.    I have no idea.
20   Q.    If somebody -- have you seen codes called
21 for other people?
22   A.    Yeah, but that was like strokes and -- I
23 talked to multiple police officers trying to get
24 them to call me over there, call a code. They

40

1  wouldn't do it. They told me to sign up for
2  nurse sick call.
3    Q.    When you say police officers, do you mean
4  the correctional officers in your housing unit?
5    A.    Correctional officers, yes.
6    Q.    Okay. Do you have any understanding on,
7  you know, if you suffer an injury can you request
8  to be seen on an emergency basis?
9    A.    You can ask. It doesn't mean they are
10 going to do it.
11   Q.    You said you asked multiple officers. Do
12 you remember who any of those officers were?
13   A.    The only one I remember is the one who
14 finally called after they canceled my third call
15 pass. CO Huff, she finally called over there for
16 me. But no one else would ever call. The only
17 reason I remember that name is because she's in
18 this Complaint.
19   Q.    So, you don't as you sit here today have
20 an independent recollection of that interaction
21 with CO Huff? You are reviewing your Complaint
22 that was previously filed?
23   A.    I remember because she told me -- I mean
24 I remember the conversation.