UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Lucas Wood

    V.                                    Case No.21-CV-2254

Jonathan Ek et al,

## RESPONSE TO DEFENDANT'S
## MOTION FOR SANCTIONS

NOW COMES plaintiff Lucas Wood, pro se, and moves this HONORABLE court to DENY defendant's motion for sanctions. In support of plaintiff says:

### INTORDUCTION

On November 11,2024, defendants Ek, Wexford, Pearson and Grant filed a frivilous motion for sanctions. Defendants took much of plaintiffs deposition out of context, as well as made assumptions which will be brought to light in this response.

### TESTIMONY REGARDING THE NURSES

Defendants make assumptions in their motion for sanctions that it was physically impossible for plaintiff to seek help in 15 seconds (See Ex 1 page #3, line68-74). Plaintiff was on the phone, a few steps away from defendant Pearson. While plaintiff was showing defendant Pearson his arm, he explained to her that he still had not been seen. Pearson was dismissive of plaintiff and told him to sign up for nurse sick call, at which point plaintiff returned to the phone. As an inmate, plaintiff knows not to argue with medical staff.

Plaintiff has a pending motion in this court to remove defendant Kitwanna Grant from this suit. Plaintiff was misled by his former

ineffective counsel, and asked this HONORABLE court in a pending motion to ORDER plaintiffs former counsel Ethan Zelizer to pay Grant's court costs. Plaintiff again appologizes to Grant and this court for his ignorance of Rule 11. Plaintiff is pro se and is learning as he goes.

<u>TESTIMONY REGARDING HIS</u>
<u>ACTIVITIES FOLLOWING HIS INJURY</u>

Defendants seem to be arguing that plaintiff claims he was not walking on his injured achilles tendon. This is not the case. Plaintiff was transparent in his complaint and in his deposition that he was climbing stairs, walkning to chow, commissary and other daily activities (See Ex. 2 page 33 line 1-15, page 34 line 1-24).

Plaintiff answered deposition questions to the best of his ability, and does not recall being in a "wellness group". Plaintiffs attendance in a program is not a material fact of this case. Morris V. McMaster-Carr Supply Co.,2002 U.S. Dist. LEXIS 10484 "Perjury is defined as false testimony concerning a material matter with the willfil intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory". Plaintiff was not intentionally providing false testimony. Over 3 years had passed and plaintiff simply does not recall a wellness group.

Plaintiff is not suing defendants because he was injured. At this point, plaintiff had not seeked medical attention. Plaintiff is suing defendants for not providing medical care once plaintiff started seeking medical attention. The delay in care once plaintiff sought treatment caused unnecessary and wanton infliction of pain and suffering.

## ARGUMENT

Defendants argue that this case should be dismissed and cite Ramirez V. T&H Lemont, Inc., 845 F.3d 772, 775-77(7th Cir.2016)(Holding dismissal is an appropriate sanction for a party soliciting a witness to lie in a court-ordered deposition). In this case, plaintiff never solicited a witness to lie, nor did he intentionally provide false testimony. Plaintiff is guilty of having a poor memory, nothing more.

Dismissal of this case is not warranted. Morris V. McMaster-Carr Supply co., 2002 U.S. Dist LEXIS 10484-"Although plaintiff gave false information in his answer to interrogatories and in his deposition, dismissal was not warranted because it was too severe of a sanction".

Defendants claim plaintiff perjured himself in regards to activities after his injury. This is simply not true. Plaintiff may not recall a 40 month old wellness group, but plaintiff admits to going to yard, commissary, chow hall and other daily activities. Plaintiff is not a doctor, and noone instructed plaintiff not to walk on his injury. Plaintiff was in pain, but he tried to be careful and tried not to worsen his condition. Plaintiff was raised to be tough and to "walk it off". once plaintiff realized his condition was worsening, plaintiff began seeking medical attention, yet it was not provided in a reasonable amount of time.

Defendants argue that plaintiff did not tell defendant Pearson of his injury when she read his TB results. This is speculation. A lot can be said in 15 seconds, especially when defendant Pearson simply told plaintiff to sign up for nurse sick call.

Plaintiff admitted in his deposition that he attended yards

(See Ex 2 page 34 line 2-7). Defendants are trying to twist words while plaintiff was trying his best to recall events from over 3 years ago.

Plaintiff did not seek medical attention for 4 days. This is true. Plaintiff was raised to be tough and to "walk it off". additionally, plaintiff knew he wouldnt be seen quickly, and would simply be given tylenol and sent back. This was common practice at Danville Corr. Center.

Plaintiff adding a wrong defendant due to his ignorance of Rule 11, and the attendance of a immaterial wellness group do not take away the facts of this case. A delay in medical care, short staffing, deliberate indifference to a serious medical need, and a monell claim. To dismiss this case and allow defendants to commit constitutional violations would be an injustice. Defendants should be held accountable for their actions and not "get off" because of a pro se inmates ignorance of Rule 11 and poor memory. This case should be allowed infront of a jury.

CONCLUSION

This court should DENY defendants motion for sanctions. Specifically, this court should NOT dismiss this case, or ORDER plaintiff to pay court costs for defendants. Plaintiff is a pro se inmate and is proceeding in forma pauperis.

WHEREFORE, for the reasons stated above, plaintiff PRAYS this honorable court DENY defendants motion for sanctions.

Respectfully submitted,

11-13-24

Lucas Wood R64297
251 N Il HWY 37
Ina,IL.62846

EXHIBIT

#

1

E-FILED
Monday, 11 November, 2024 02:50:40 PM
Clerk, U.S. District Court, ILCD

EXHIBIT
B

1    **7/23/21 8:38 A.M. – Phone Call between Lucas Wood and Liz Lampson**

2    AUTOMATED VOICE - Hello this a free call from [WOOD-"it's me"] an incarcerated individual
3    at Danville Correctional Facility. This call is subject to recording and monitoring. To accept this
4    free call press. Be aware that any attempt to add a third party to any call from Illinois DOC will
5    result in inmate disciplinary action and the involved and user's phone number will be globally
6    blocked from future calls from all Illinois DOC facilities. Thank you for using Securous. You
7    may start the conversation now.

8    WOOD - Good morning

9    LAMPSON - Good morning

10    WOOD - How are you?

11    LAMPSON - Pretty good. How are you?

12    WOOD - Alright.

13    LAMPSON - Good.

14

15
16    # Redacted
17

18

19

20

21

22

23

24

25

26

27

1

28
29
30      Redacted
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52

53
54

# Redacted

55

56

57

58

59
60

61

62

63
64

65

66

67

68  WOOD – Oh one second one second **(gone 5:01 to 5:16)** alright the nurse had to check my TB
69  test

70  LAMPSON - Oh

71  WOOD – Yeah had a shot the other day

72  LAMPSON - They can give you a shot but they can't look at your God damn ankle

73  WOOD – I know I told you they called me over there and I thought it was for my ankle, but it just
74  was to give me a fucking TB shot

75  LAMPSON - I did not what the fuck

76  WOOD – Yeah

77  LAMPSON - Wow

78  WOOD – They do that like every year around your birthday they call you over for a physical and
79  like literally they give you a TB shot and they used to make you drop your pants and like look at
80  your nuts real quick like

81
82
83
84
85

# Redacted

86
87
88
89
90
91
92
93
94
95
96
97
98
99
100
101
102
103
104
105
106

107
108
109
110

111

112

113

114

115

116

117

118

119

120
121
122

123
124

125

126

127

128

129

130

131

132

133

134

Redacted

135

136

137 Redacted

138

139

140

141

142

143

144

145
146

147

148

149

150

151

152

153

154

155

156

157

158

159

160
161
162
163
164
165
166
167
168
169
170
171
172
173
174
175
176
177
178
179
180
181
182
183
184
185

# Redacted

186

187

188

189
190

# Redacted

191
192

193

194

195

196

197
198

199
200
201

202

203
204
205

206

207

208

209
210

211

212

213

214

215
216
217
218
219
220
221

222
223
224

225

226

227
228

229

230

231

232

233
234

235

236

237

238

239

240

241
242

# Redacted

243
244
245

# Redacted

246
247
248
249
250
251
252
253
254
255
256
257
258
259
260
261
262
263
264
265
266
267
268
269

270
271
272
273
274

# Redacted

275
276
277
278
279
280
281
282
283
284
285
286
287
288
289
290
291
292
293
294
295

296
297
298
299
300
301
302
303

Redacted

EXHIBIT

#

2

E-FILED
Monday, 11 November, 2024 EXHIBIT A PM
Clerk, U.S. District Court, ILCD

**Page 1**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

LUCAS WOOD,

    Plaintiff,

    vs.    No. 21-CV-2254

DR. JONATHAN EK, WEXFORD
HEALTH SOURCES, INC.,
JENNIFER CHICONE, CARLE
PHYSICAL THERAPY, JOHN
CURTIS, AND UNKNOWN EMPLOYEES)
OF WEXFORD,

    Defendants.

DEPOSITION OF LUCAS WOOD
APPEARING REMOTELY
APRIL 9, 2024
10:00 a.m.

REPORTED BY:
LORRAINE MCCREIGHT
CSR NO. 084-003070
APPEARING REMOTELY FROM PEORIA COUNTY, ILLINOIS

**Page 2**

PRESENT:

JOY C. SYRCLE, ESQ.
CASSIDAY SCHADE LLP
2040 West Iles Avenue
Suite B
Springfield, IL 62704
jsyrcle@cassiday.com
for Defendants Wexford Health
Sources, Inc., Dr. Jonathan
Ek, Kitwana Grant & Alicia
Pearson;

PAUL WATKISS, ESQ.
ASSISTANT ATTORNEY GENERAL
115 S. LaSalle Street
Suite 2800
Chicago, IL 60603
Paul.watkiss@ilag.gov
for Defendant Jennifer
Chicone.

**Page 3**

I N D E X

WITNESS    PAGE

LUCAS WOOD

    Examination By Ms. Syrcle ..................4
    Cross By Mr. Watkiss ......................81
    Redirect By Ms. Syrcle ...................104

E X H I B I T S

NUMBER    MARKED FOR ID

Deposition Exhibit

    No. 1 ......................................  26
    No. 2 ......................................  69
    No. 3 ......................................  71

**Page 4**

LUCAS WOOD

being first duly sworn,

was examined and testified

as follows:

DIRECT EXAMINATION

BY MS. SYRCLE:

    Q.  Good morning, Mr. Wood.

        Would you please state and spell your name for the record?

    A.  Lucas Wood, L-U-C-A-S, W-O-O-D.

    Q.  I introduced myself before we went on the record, but I am Joy Syrcle. I am counsel for Wexford, Dr. Ek, Kitwana Grant and Alicia Pearson.

        Have you ever been deposed before?

    A.  No.

    Q.  I'm going to go over just a couple sort of general background rules how this process works. So, this is our opportunity to ask questions. You can see that we have a court reporter who's taking down everything that we say, so it's really important that we not talk over each other, especially given that we are

5

1  appearing via Zoom today so we are not present in
2  the room together. So, I will do my best to let
3  you finish answering a question before I start to
4  ask the next question, and I would ask that you
5  let me finish asking a question before you start
6  to answer.
7         Does that make sense?
8    A.  Yes.
9    Q.  It's also really important that you
10  answer verbally because the transcript won't
11  accurately reflect things like a head shake or
12  nod or uh-huh, huh-uh type answers.
13        Does that make sense?
14    A.  Yes.
15    Q.  And you understand that you are placed
16  under oath. You were just sworn in.
17    A.  Yes.
18    Q.  So, anything that you say today will have
19  the same force and effect as if you were in a
20  court of law.
21        Do you understand that?
22    A.  Yes.
23    Q.  If you don't understand a question that I
24  ask, please ask me to rephrase it, let me know

6

1  that you don't understand what I am asking. If
2  you answer, I will assume that you understood the
3  question. And I won't be offended by any means
4  if you ask me to rephrase because we want a good
5  transcript at the end.
6         If you need to take a break at any point,
7  I don't know what the process is on your end of
8  things, but I am happy to take a break as long as
9  there is not a question pending. You know, if
10  you need a few minutes, if you need a restroom
11  break or a drink or something, just let me know.
12  And if there's a question pending I would just
13  ask that you answer that question before we go
14  off the record.
15        Are you aware of any reason such as
16  medication or something like that that you
17  would -- it would prevent you from being able to
18  testify truthfully here today?
19    A.  No.
20    Q.  Have you taken any medications this
21  morning?
22    A.  Yep.
23    Q.  What medications have you taken?
24    A.  Lisinopril and my blood pressure

7

1  medication.
2    Q.  Okay. And neither of those would, you
3  know, interfere with your cognition or memory in
4  any way, right?
5    A.  Nope. I'm ready.
6    Q.  No drugs or alcohol, right?
7    A.  Yeah.
8    Q.  I'm going to ask just a little bit of
9  background about you -- well, first let me ask,
10  you are -- you are testifying today from East
11  Moline Correctional Center, is that correct?
12    A.  Correct.
13    Q.  The allegations in your Complaint take
14  place at Danville, correct?
15    A.  Correct.
16    Q.  Did you do anything to prepare for your
17  deposition today?
18    A.  Yes.
19    Q.  What did you do?
20    A.  I read about being deposed.
21    Q.  Okay. So, did you find some sort of
22  reference material from the law library?
23    A.  I have many legal books since I started
24  this case.

8

1    Q.  Okay. So, it was -- you said read about
2  being deposed. Is it just general information
3  about depositions?
4    A.  And tips, I guess you could say.
5    Q.  Okay. Strategies as a witness?
6    A.  Not so much that. More of, you know,
7  take your time before answering, and you know, if
8  you don't know, say you don't know because it's
9  on the record.
10    Q.  Okay. Good advice.
11        Were any of the materials that you
12  reviewed regarding depositions, were any of
13  them -- nothing was specific to this case, right?
14    A.  No.
15    Q.  Did you review any materials specific to
16  this case?
17    A.  I know this case like the back of my
18  hand.
19    Q.  Do you have any materials there with you
20  today?
21    A.  I have everything here with me today.
22    Q.  When you say everything, can you tell me
23  what you have?
24    A.  My Complaint and all my exhibits and my

9

1  notebook with notes.
2      Q.    Okay.  So, you said your Complaint and
3  your exhibits.  In this case you have the
4  original Complaint and the Amended Complaint, is
5  that right?
6      A.    Yes.
7      Q.    Are those the only two Complaints that
8  you have in front of you?
9      A.    I only have my Amended Complaint.
10     Q.    Okay.  You said the exhibits to the
11 Complaint.  Is that limited to things that you
12 actually filed with the Court with your
13 Complaint?
14     A.    I believe it's everything that you have.
15 I mean, I think I have 21 exhibits.
16     Q.    Okay.  Let me --
17          MR. WATKISS:   Joy, that's docket
18 number 24 in the suit where all of those exhibits
19 are located.
20 BY MS. SYRCLE:
21     Q.    Is that correct, Mr. Wood?
22          That's what I was just pulling up.  Is
23 docket number 24?
24     A.    It might be.  I don't know the docket

10

1  number but I know I sent it all in initial
2  disclosures.
3      Q.    There is a cover sheet that lists 21
4  exhibits, is that right?
5      A.    Yes.
6      Q.    And that's the document that you are
7  referring to in front of you?
8      A.    Yeah.
9      Q.    Okay.  You said you have a notebook with
10 notes.  Can you describe what that is?
11     A.    (Indicating.)
12     Q.    Are those notes that you took
13 contemporaneously with events or like as things
14 were happening?
15     A.    Yes.  Drafts to all of my motions that I
16 typed and notes I have taken about other people's
17 summary judgments that I have been doing.
18     Q.    Okay.  Have those been produced to us?
19     A.    No.
20     Q.    Are there details about this case in that
21 notebook?
22     A.    No.  Well, I mean there's details about
23 this case in here, yeah, but other cases as well.
24     Q.    When you say drafts of your motion, are

11

1  you referring to motions that were filed in this
2  case?
3      A.    Yes.
4      Q.    Are there other notes reflecting events
5  as they were occurring?
6      A.    From like 2021 when this case -- like
7  when I hurt myself?
8      Q.    Correct.
9      A.    No.
10     Q.    What is the first -- the date of the
11 first entry in that notebook?
12     A.    November 2023.
13     Q.    Anything else that's in front of you
14 there today?
15     A.    I mean, I have a whole legal binder, but
16 a lot of it's other legal cases.
17     Q.    Okay.  So, those are -- are there
18 materials related to this case in here --
19     A.    Yeah.
20     Q.    -- in there?
21     A.    Yes.
22     Q.    Are they all materials that have been
23 filed with the Court or provided in discovery?
24     A.    No.  But I did make copies of them today

12

1  and I plan to send them to you today.
2      Q.    Okay.  Can you describe for me what those
3  documents are?
4      A.    I have Defendant X Final Order of
5  Suspension alleging or finding him guilty of the
6  substance abuse, the sexual misconduct, and other
7  things.  I have a Declaration.  I have a Freedom
8  of Information Act on Defendant Jennifer Chicone
9  and her job responsibilities and the amount of
10 time she's supposed to be spending on them.  And
11 I believe I have some of the Lippert report about
12 Wexford being made aware that they were
13 deliberate and indifferent to IDOC inmates.
14     Q.    Referring to X Suspension, that is
15 referencing something that happened in Oklahoma
16 more than a decade ago, is that right?
17     A.    Yes.
18     Q.    You said a Declaration.  Who is the
19 Declaration from?
20     A.    Her name is Jamie Peatree.
21     Q.    What is the substance of the Declaration?
22     A.    That she was aware that I was in pain and
23 that she was talking to me daily and trying to
24 get me help at Danville.

13

1    Q.    Who is Jamie Peatree?
2    A.    A friend.
3    Q.    Okay.  So, she is somebody who was
4    outside the Department of Corrections?
5    A.    Yes.
6    Q.    And you said a Freedom of Information Act
7    about Chicone.  Is that you submitted a FOIA
8    request to the Department of Corrections?
9    A.    Yes.
10   Q.    Okay.  And you have what they responded,
11   is that right?
12   A.    Yes.
13   Q.    Okay.  And those are all things that you
14   are producing to us today?
15   A.    Yes.
16   Q.    Did you -- you referenced the Complaint
17   and the Amended Complaint.  Did you write those
18   yourself?
19   A.    Yes.
20   Q.    Did you have assistance from any inmate
21   or anybody outside the Department to prepare
22   those?
23   A.    I did get some assistance, yes.
24   Q.    Who did you get assistance from?

14

1    A.    A guy that helped me when I was becoming
2    a paralegal.
3    Q.    Who was that?
4    A.    His name is Daniel Mackel.
5    Q.    Is he an inmate?
6    A.    Yes.
7    Q.    Is he in Danville, or was he at the time?
8    A.    Yes, he is.
9    Q.    Are you currently -- did you complete the
10   process to become a paralegal?
11   A.    I am a Certified Legal Assistant, yeah.
12   Q.    And how long ago did you do that?
13   A.    About a year ago.
14   Q.    And you have been certified ever since?
15   A.    Yes.
16   Q.    How long was that process?
17   A.    About two years.
18   Q.    Did you do that like a correspondence
19   course or did somebody come to the facility?
20   A.    Correspondence through Blackstone Career
21   Institute.  It's an accredited school in
22   Pennsylvania, I think.
23   Q.    Okay.  Did you speak with anybody to
24   prepare for your deposition today?

15

1    A.    No.
2    Q.    Okay.  I'm going to -- now I'll ask some
3    just general background questions about you.
4    Where were you born?
5    A.    Elgin, Illinois.
6    Q.    And what was your date of birth?
7    A.    July 5th, 1989.
8    Q.    Did you live in the Elgin area from the
9    time you with born until at least until the time
10   you were incarcerated?
11   A.    Majority of it but not all of it.
12   Q.    Where else did you live?
13   A.    DeKalb, Illinois.
14   Q.    Was your current incarceration out of
15   DeKalb County?
16   A.    Yes.
17   Q.    Were you living in DeKalb when you were
18   incarcerated for this day in IDOC?
19   A.    Yes.
20   Q.    Do you have family in central Illinois?
21   When I say central Illinois I'm referring to
22   Springfield, Danville, Peoria, that sort of
23   swath?
24   A.    No.  My wife lives in the Quad Cities.

16

1    Q.    What's your wife's name?
2    A.    Sarah Wood.
3    Q.    How long have you been married?
4    A.    Almost a year.
5    Q.    You were incarcerated when you married?
6    A.    Yes.
7    Q.    What was her maiden name?
8    A.    Duncan.
9    Q.    You said she lives in the Quad Cities?
10   A.    Yes.
11   Q.    Where in the Quad Cities?
12   A.    LeClaire, Iowa.
13   Q.    Were you married before?
14   A.    No.
15   Q.    Any children?
16   A.    Yes.
17   Q.    How many children?
18   A.    I have one daughter.
19   Q.    What's her name?
20   A.    Brooklyn.
21   Q.    How old is she?
22   A.    Thirteen.
23   Q.    And where does she live?
24   A.    DeKalb.

17

1    Q.   Did her mother also live in DeKalb?
2    A.   Yes.
3    Q.   What's her mother's name?
4    A.   Tiffany.
5    Q.   Last name?
6    A.   Gladson.
7    Q.   Is your daughter's last name Wood?
8    A.   Yes.
9    Q.   Do you go by any nicknames or aliases?
10    A.   Luke.
11    Q.   Okay.  That's it?  Anything else?
12    A.   Nope.
13    Q.   If the guys see you on the yard do they
14  call you Luke?
15    A.   Yep.
16    Q.   We talked about a little bit about your
17  paralegal certificate.  Did you graduate from
18  high school?
19    A.   I have a G.E.D.
20    Q.   When did you get the G.E.D.?
21    A.   I want to say -- don't quote me, but
22  around 2006.
23    Q.   Okay.  Were you out in the community when
24  you got the G.E.D. or were you incarcerated at

18

1  the time?
2    A.   I was home, and I got it from Kishwaukee
3  College.
4    Q.   So, the G.E.D., paralegal certificate,
5  any other college type courses or community
6  college courses?
7    A.   I'm a licensed barber, and I am in a
8  college program right now getting a bachelor's
9  degree in communications through Augustana.
10    Q.   Okay.  How long have you been a licensed
11  barber?
12    A.   Almost ten years.
13    Q.   Did you work as a barber in the
14  community?
15    A.   I did.  I owned a barbershop.
16    Q.   Have you worked at all as a barber while
17  being in the Department of Corrections?
18    A.   Not during this incarceration, no.  I'm a
19  full-time student.
20    Q.   Okay.  How long have you been working on
21  the communications degree?
22    A.   I'm finishing up my sophomore year now.
23  So, two years.
24    Q.   Okay.  Good for you.  Any other training,

19

1  vocational training or anything like that?
2    A.   No.
3    Q.   Any medical training?
4    A.   No.
5    Q.   You are currently incarcerated for a --
6  currently incarcerated on a charge of domestic
7  battery, is that correct?
8    A.   Correct.
9    Q.   And you have been in the Department of
10  Corrections since 2020, is that correct --
11    A.   Yes.
12    Q.   -- during this stay?
13    In custody since December of 2019,
14  correct?
15    A.   Correct.
16    Q.   And it shows a projected parole date of
17  2026.  Is that accurate?
18    A.   Yep.
19    Q.   And it looks like you have had prior
20  incarcerations, the first being in 2007, correct?
21    A.   Correct.
22    Q.   Burglary, criminal damage to property,
23  was that the first incarceration?
24    A.   Yes.  I was a teenager.

20

1    Q.   Okay.  It looks like in 2011 you were
2  incarcerated for aggravated battery of a pregnant
3  person, is that correct?
4    A.   Yep.
5    Q.   And then there's a custody date of 2012.
6  Was that all part of the 2011 incarceration or
7  were those two separate stays?
8    A.   Two separate stays.
9    Q.   Okay.  So, in 2012 there's a charge for
10  aggravated domestic battery, it looks like
11  strangle, is that correct?
12    A.   Yeah.
13    Q.   And then in 2019 there was a separate
14  incarceration for aggravated battery of a police
15  officer, is that correct?
16    A.   Correct.
17    Q.   Does that cover all of your felony
18  incarcerations?
19    A.   Home invasion.  That's what I'm actually
20  here for now.  I served the time for the
21  domestic.
22    Q.   I see that, that there were two charges
23  on this incarceration, is that right?
24    A.   Yes.

21

1   Q.   Okay.
2   A.   Three.
3   Q.   Does that cover all of your felony
4   incarcerations?
5   A.   Yes.
6   Q.   Have you ever been convicted of a crime
7   involving dishonesty like forgery, fraud,
8   anything like that?
9   A.   No.
10  Q.   While in the Department of Corrections
11  have you been disciplined?
12  A.   I mean, yes.
13  Q.   Were any of the -- was any of the
14  discipline for an offense of dishonesty like
15  giving false information to an officer?
16  A.   Yes.
17  Q.   When was that?
18  A.   I think it was around 2021. But I wasn't
19  dishonest but I did get a ticket for providing
20  false information. It wasn't false, but I'm at
21  their whim.
22  Q.   Okay. And you were actually disciplined
23  for that, is that right?
24  A.   Yes.

22

1   Q.   Okay. What were the circumstances
2   surrounding that?
3   A.   I was at work on my day off covering for
4   one of my coworkers, and when he came back to
5   work I left. And when the person who strip
6   searched me out of work asked where I was going I
7   told him that I had a call pass. I told her it
8   And then when I got back to my unit the officer
9   asked me why I was back so early. I told her it
10  was my day off, which is also true. But when
11  they talked, since I told them both different
12  things, they wrote me a ticket for providing
13  false information.
14  Q.   Okay. So, you actually had a call pass
15  and you left because you were going to go -- was
16  the call pass for healthcare?
17  A.   No, it was to become a peer mentor. I
18  was trying to become a peer mentor.
19  Q.   Okay. And then you were actually going
20  to wherever you needed to go for that call pass?
21  A.   Yes.
22  Q.   When approximately was that in 2021, do
23  you recall?
24  A.   I don't.

23

1   Q.   Okay. Any other infractions related to
2   giving false information to an officer?
3   A.   No.
4   Q.   So, I know you are in East Moline now,
5   but I want to talk about Danville because the
6   claim arises out of Danville.
7        Were you employed -- I think what you
8   just described was something related to a job
9   while you were at Danville, is that right?
10  A.   Correct.
11  Q.   Where did you work at Danville?
12  A.   Officer's commissary.
13  Q.   How long did you hold that job?
14  A.   About two, three weeks.
15  Q.   Okay. Did you lose the job in relation
16  to that discipline?
17  A.   I did.
18  Q.   So, do you remember when, you know, the
19  time frame in which you held that job?
20  A.   I do not.
21  Q.   Like the month?
22  A.   I do not.
23  Q.   I thought I had something with it on
24  there but I have closed it.

24

1        Do you remember if it was early in the
2   year in 2021 or later in the year?
3   A.   I would guess around June, July, because
4   shortly after that I transferred to East Moline.
5   Q.   Okay. So, let's back up.
6        You said 2021, right, that you held the
7   job in the Officer's commissary?
8   A.   It was 2021 or 2022. I don't know. It's
9   all --
10  Q.   Okay.
11  A.   Do you know what year I got to East
12  Moline?
13  Q.   Well, you didn't transfer to East Moline
14  until 2022 according to our record.
15  A.   All right. So, it was 2022.
16  Q.   So, you held the job in the Officer's
17  commissary just before the transfer to East
18  Moline?
19  A.   Correct.
20  Q.   And would that then be the time frame
21  that you got the discipline that you were
22  referring to?
23  A.   Yes.
24  Q.   Okay. Any other jobs while you were at

25

1  Danville?
2      A.    No.
3      Q.    So, what was a typical day like for you
4  in Danville?
5      A.    I mean, you are pretty much in your room
6  all day.
7      Q.    Did you have yard?
8      A.    Yeah.
9      Q.    Did you go to yard when it was offered?
10     A.    Sometimes.
11     Q.    Why just sometimes?
12     A.    I mean, sometimes you just want the room
13  to yourself, you know.  I mean, you get -- you
14  know, you are with somebody in a room 24 hours a
15  day, you just want some you time.
16     Q.    Okay.  How often, you know, 2021, how
17  often in 2021 do you think that you chose to stay
18  in the room instead of go to yard?
19     A.    I went to yard more than I didn't.  But
20  in 2021 I think I was in -- prior to the incident
21  I probably went out more.
22     Q.    Okay.  Let's talk about -- so, the
23  allegations in this case happened in -- the
24  injury that you are alleging happened in July of

26

1  2021, right?
2      A.    Correct.
3      Q.    Okay.  So, in -- were you -- did you hold
4  a job at all in July of 2021?
5      A.    No.
6      Q.    I'm going to mark as an exhibit a
7  document that was produced in this case.  It is
8  your Trust Fund Ledger.  I'm going to share my
9  screen.
10            This will be Exhibit 1.
11
12            (Whereupon Deposition
13             Exhibit No. 1 was marked
14             for identification.)
15
16  BY MS. SYRCLE:
17     Q.    Can you see a document on the screen?
18     A.    Yes.
19     Q.    That's Danville Correctional Center Trust
20  Fund Inmate Transaction Statement.
21            Do you see that?
22     A.    Yes.
23     Q.    In references -- this is Wood, Lucas, and
24  this is your IDOC number, is that right, up here

27

1  in the corner?
2      A.    Yes.
3      Q.    Is this familiar to you from discovery in
4  this case?
5      A.    Did I have to send this when I filed the
6  in forma pauperis?
7      Q.    So, this was actually exchanged -- down
8  here it's got an IDOC Bates number.  And the
9  Bates number is the consecutive numbering for
10  documents produced in discovery.  And I will
11  represent to you that this was produced in
12  discovery by counsel for Miss Chicone.
13     A.    Okay.
14     Q.    Does this -- but do you remember seeing
15  this document either in discovery or if you have
16  ever -- let me ask this.
17            Have you ever asked for a copy of your
18  Trust Fund Ledger?
19     A.    I had to when I filed in forma pauperis.
20     Q.    So, you have seen a document like this.
21     A.    Yes.
22     Q.    And if I scrolled down and we look at the
23  month of July of 2021, there's a reference to
24  payroll and payroll adjustment.  Payroll for

28

1  month of June of 2021?
2      A.    Uh-huh.
3      Q.    If we scroll down there is payroll
4  adjustment on August 12 of 2021, payroll month of
5  July of 2021.  Do you see those?
6      A.    I do.
7      Q.    Do you know what you are receiving money
8  for on a payroll?
9      A.    I do.  Every inmate in IDOC gets a state
10  pay because they don't provide us soap or hygiene
11  and we are made to buy ourselves -- you don't
12  need to have a job or be in school.  Every inmate
13  gets state pay.
14     Q.    So, this payroll is referring only to
15  state pay and not for anything that you were
16  doing at Danville, is that right?
17     A.    Correct.
18     Q.    Okay.  So, prior to July of 2021, your
19  typical day, you had yard.  How often did you
20  have yard?
21     A.    Five times a week, four times a week.
22     Q.    And how long would yard be?
23     A.    An hour.
24     Q.    When you say five times, would it be like

29

1  one hour a day for five days?
2     A.   Yeah.
3     Q.   And you went more often than not you
4  said, is that right?
5     A.   Correct.
6     Q.   How about gym, did you have a gym?
7     A.   Yes.
8     Q.   How often would you go to gym?
9     A.   Less than I would go to yard.
10    Q.   Was it offered at different times?
11    A.   You would get typically one or the other
12  almost every day.
13    Q.   Okay.  What kinds of things, what kinds
14  of activities did you do on the yard?
15    A.   Prior to July of 2021?
16    Q.   Yes.
17    A.   I liked to play soccer.  I liked to play
18  basketball.  I lift weights.
19    Q.   Okay.  What kind of weights?
20    A.   Free weights.
21    Q.   What type of weightlifting?  Like what
22  type?  I mean, did you do squats, deadlifts,
23  curls?  Like shoulder presses?  I mean, all of
24  the -- chest press?  Like all of the above?

30

1     A.   All of the above.
2     Q.   Okay.  Anything else on yard?
3     A.   Horseshoes.
4     Q.   Okay.  How about the gym, what kinds of
5  activities in the gym?
6     A.   Weight lift.
7     Q.   Same type of lifting?
8     A.   Yes.
9     Q.   So, did you have any classes or groups or
10  anything like that that you attended --
11    A.   No.
12    Q.   -- the time frame prior to July of 2021?
13    A.   No.
14    Q.   Anything else that you did to pass the
15  time outside your cell in July, prior to July of
16  2021?
17    A.   No.
18    Q.   Where were you housed in July of 2021?
19    A.   Three House.
20    Q.   And were you first level, second level?
21  Do you recall?
22    A.   Second level.
23    Q.   You had a low bunk permit, right?
24    A.   Correct.

31

1     Q.   And the low bunk permit was for seizures,
2  is that right?
3     A.   Correct.
4     Q.   So, I assume you had a low bunk, right?
5     A.   Yes.
6     Q.   How far was Three House from like Chow
7  Hall?
8     A.   Probably a little less than a quarter
9  mile, but it's a good hike.
10    Q.   Okay.  So, I have been to Danville.  How
11  many -- so, Three House, how many buildings are
12  in between.  Because I know it's laid out in
13  multiple buildings sort of with a quad sort of
14  area in the middle, right?
15    A.   Well, you have the Chow Hall in the
16  right, and to the left of that is One House, then
17  Two House, then Three House, then the yard and
18  Four House.
19    Q.   And then does it wrap back around to
20  where like Healthcare is over here to the right
21  then?
22    A.   That's right where you come in if you
23  were coming in, it's that building just farther
24  down in that Administration Building.

32

1     Q.   Okay.  So, just to clarify the Chow Hall
2  and the Healthcare Unit are in the same building,
3  just further down?
4     A.   No.  The Healthcare is in the same
5  building as the Administration Building where you
6  would walk in.
7     Q.   And Chow Hall is on the other side --
8     A.   Yeah.
9     Q.   -- of the open space in the middle?
10    A.   In Healthcare to Three House is probably
11  about a quarter mile.
12    Q.   Okay.  And prior to July of 2021 how
13  often did you go to chow?
14    A.   Every day.
15    Q.   Was it three meals a day at Chow Hall or
16  were any meals in your housing unit?
17    A.   No.
18    Q.   So, did you go to three meals a day?
19    A.   I would go to lunch and dinner.
20    Q.   How about commissary, where is commissary
21  located?
22    A.   That's the same building as the Chow
23  Hall, just a little farther away.
24    Q.   And prior to July of 2021 did you go to

33

1 commissary?
2    A.   Yeah.
3    Q.   How often did you get to go to
4 commissary?
5    A.   Once every three to five weeks.
6    Q.   What is the process? I mean, do you -- I
7 have heard of guys saying they would take like a
8 pillow case or something and put the stuff from
9 commissary in to bring back. Do you have a
10 process like that for how you got stuff back?
11    A.   I have a big mesh laundry bag that I walk
12 over there and grab my stuff and bring it back.
13    Q.   Okay. And did you go to commissary
14 pretty much any time it was offered?
15    A.   Yes.
16    Q.   So, let's talk about then after July 11
17 of 2021. How often were you -- so, you were in
18 the Infirmary beginning in September of 2021,
19 right?
20    A.   Sounds right.
21    Q.   So, in the time period between July 11
22 and September, I believe it's September 3rd of
23 2021, during that time period how often were you
24 going to yard?

34

1    A.   I couldn't.
2    Q.   So, you couldn't go to yard at all after
3 the injury from January -- excuse me, from
4 July 11, 2021?
5    A.   I went a few times, I would hobble out
6 there, but I usually had to have like someone
7 help me.
8    Q.   How about commissary, were you able to go
9 to commissary?
10    A.   I went but it hurt.
11    Q.   Were you able to continue going to Chow
12 Hall?
13    A.   I went when I had to.
14    Q.   What do you mean by when you had to?
15    A.   I can't -- you know, if I didn't have
16 food in my box to eat.
17    Q.   By in your box, do you mean from
18 commissary?
19    A.   Yes.
20    Q.   Anything else? Did you go to gym during
21 that time period from the July 11 to
22 September 3rd, 2021?
23    A.   I don't think so. I usually just went to
24 yard because I could sit out there, you know, and

35

1 get fresh air. But I would have to walk to the
2 shower every day. I'd have to walk up and down
3 the stairs to get to the phone every day.
4    Q.   Were you in a program called the Wellness
5 Group?
6    A.   No.
7    Q.   You didn't ever attend a program in the
8 yard called the Wellness Group?
9    A.   That does not ring a bell, no.
10    Q.   Do you ever remember participating in a
11 group exercise program on the yard?
12    A.   I remember signing up for one.
13    Q.   And it's your testimony you didn't
14 actually participate in it?
15    A.   No.
16    Q.   Did you -- actually, I'll hold that.
17       Have you filed any other lawsuits related
18 to any personal injury or civil rights cases
19 related to your incarceration?
20    A.   No.
21    Q.   Can you explain to me the process at
22 Danville for getting medical care?
23    A.   How it is or how it's supposed to be?
24    Q.   What was the process? Like what -- let

36

1 me ask you this.
2       Did you get -- when you transferred into
3 Danville, did you get an inmate handbook?
4    A.   Yes.
5    Q.   Did it have a section in it on this is
6 the process for the instructions to you on how to
7 get medical care?
8    A.   Yes.
9    Q.   What is the process that's set up?
10    A.   I would write a request slip requesting
11 to go to nurse sick call, and they are supposed
12 to triage it and see you the next day.
13    Q.   Okay. You say they are supposed to
14 triage it. What do you mean by triage it?
15    A.   By the level of importance I'm assuming.
16 I'm not 100 percent sure. I know in the Lippert
17 stuff that I either sent you or am sending you it
18 talks about it.
19    Q.   So, you think that the nurses have a
20 process where they review the requests that you
21 send and triage as to whether or not you need to
22 be seen?
23    A.   In level of importance, I believe.
24    Q.   And that's based on something that you

37

1    think you read in the Lippert report?
2        A.    Yes.
3        Q.    So, you submit the sick call slip.  What
4    is -- is there a form in your housing unit?  What
5    is it that you submit?
6        A.    It's called a request slip.  It's just to
7    and from and what you want.  You can do it on a
8    normal piece of paper if you don't have one.
9        Q.    Okay.  And where do you submit it?
10       A.    To the institutional mailbox.
11       Q.    Okay.  So, there's -- is that separate
12   from -- is there like a grievance box and a
13   mailbox that are separate?
14       A.    Yes.
15       Q.    And so it's the box with a slit in the
16   top that you slip your request in the top, is
17   that right?
18       A.    Correct.
19       Q.    Is that located in your housing unit?
20       A.    In the foyer of the housing unit, yes.
21       Q.    Okay.  So, you have access to that on --
22   any day that you want to submit you have access
23   to submit something into that box, is that right?
24       A.    Yes.

38

1        Q.    Do you keep a copy of any of the sick
2    call slips that you submit?
3        A.    I don't have access to make copies.
4        Q.    Okay.  What happens then -- so, you
5    believe that the nurses triage and determine the
6    degree of importance.
7              Do you get -- you get a call pass, right,
8    to come over?
9        A.    Yes.
10       Q.    Is that how you are notified that you are
11   signed up for sick call?
12       A.    Yes.
13       Q.    And how do you get that notification?
14   How do you get that call pass?
15       A.    They pass out call passes every evening.
16       Q.    So, you would get it for the next day?
17       A.    Yes.
18       Q.    And what is the process then?  Does the
19   call pass tell you what time?
20       A.    Yes.
21       Q.    And what is the process for you getting
22   to go to Healthcare?
23       A.    They see that I have a call pass at a
24   certain time.  They will, you know, say 1:00 call

39

1    passes.  And if you have one you hit your button
2    and that will unlock your door.
3        Q.    Okay.  And then you walk over to the
4    Healthcare Unit and wait to be seen?
5        A.    Correct.
6        Q.    Okay.  Is there a different process if
7    you have an emergency?
8        A.    You could talk to the police, but I tried
9    that.  I talked to the Warden.  I had my family
10   calling.  I wrote grievances.  I don't know how
11   much else I could have tried.
12       Q.    Is there a process that's called a Code
13   3?
14       A.    I mean, I don't know the codes, but I
15   know like medical emergency, like if you have a
16   heart attack or something.
17       Q.    Do you know what the process is for
18   calling a code?
19       A.    I have no idea.
20       Q.    If somebody -- have you seen codes called
21   for other people?
22       A.    Yeah, but that was like strokes and -- I
23   talked to multiple police officers trying to get
24   them to call me over there, call a code.  They

40

1    wouldn't do it.  They told me to sign up for
2    nurse sick call.
3        Q.    When you say police officers, do you mean
4    the correctional officers in your housing unit?
5        A.    Correctional officers, yes.
6        Q.    Okay.  Do you have any understanding on,
7    you know, if you suffer an injury can you request
8    to be seen on an emergency basis?
9        A.    You can ask.  It doesn't mean they are
10   going to do it.
11       Q.    You said you asked multiple officers.  Do
12   you remember who any of those officers were?
13       A.    The only one I remember is the one who
14   finally called after they canceled my third call
15   pass.  CO Huff, she finally called over there for
16   me.  But no one else would ever call.  The only
17   reason I remember that name is because she's in
18   this Complaint.
19       Q.    So, you don't as you sit here today have
20   an independent recollection of that interaction
21   with CO Huff?  You are reviewing your Complaint
22   that was previously filed?
23       A.    I remember because she told me -- I mean
24   I remember the conversation.

E-FILED
Monday, 11 November, 2024 04:06:39 PM
Clerk, U.S. District Court, ILCD

41

1    Q.    Okay.  So, are you just looking at your
2  Complaint to get her name?
3    A.    No.
4    Q.    Okay.  You said -- you just testified you
5  only remember because it's in the Complaint,
6  right?
7    A.    I only remember her name, but I remember
8  the conversation.
9    Q.    Okay.  When did you first ask someone to
10  be seen for -- at Healthcare?
11    A.    July 11th.
12    Q.    Where did that happen?
13    A.    When I was coming in off the yard I had
14  two buddies, I had my hand over each of their
15  shoulders walking in, and the CO that was
16  counting us coming in, the count to see that the
17  same amount people came in that left, I told him
18  that I really messed up my leg and if he could
19  call me over to Healthcare.  And he told me no,
20  to sign up for nurse sick call.
21    Q.    Who were the two buddies?
22    A.    One's name was Rusty, and the other
23  one -- I forgot his name.
24    Q.    Do you remember anything about him?

43

1    A.    No.
2    Q.    And after you came back you were admitted
3  to the Infirmary, right?
4    A.    Yes.
5    Q.    And remained in the Infirmary from
6  June 9th to June 23rd, is that correct?
7    A.    Yeah.  They had to repack my hand every
8  day.
9    Q.    Okay.  Dr. Ek, we had already talked
10  about Dr. Ek had given you a low bunk permit for
11  a seizure disorder, right?
12    A.    Yeah.
13    Q.    What's the chuckle?
14    A.    I mean, it would be a low blow if he
15  wouldn't give me one for seizures.
16    Q.    Okay.  So, had you had seizures since
17  coming to Danville?
18    A.    Yes.
19    Q.    When did you have a seizure?
20    A.    I have probably three a month.
21    Q.    Are you still having seizures?
22    A.    Yes.
23    Q.    When was the last seizure?
24    A.    A couple days ago.

42

1    A.    He was tall.  Probably forties.
2    Q.    White?  Black?
3    A.    White.
4    Q.    Do you remember Rusty's last name?
5    A.    I don't.  He went home shortly after
6  that.
7    Q.    Anything about the officer that you
8  talked to coming in off the yard?
9    A.    I do not remember.
10    Q.    Do you know his name?
11    A.    No.
12    Q.    No description?
13    A.    He was white.
14    Q.    You had been -- prior to the incident on
15  July 11, in June you had like a spider bite on
16  your arm, right?
17    A.    Correct.
18    Q.    And Dr. Ek sent you out to the emergency
19  room, right?
20    A.    I don't know if it was him or not, but
21  somebody sent me out, yeah.
22    Q.    Okay.  If the records show the order was
23  from Dr. Ek, you don't have any reason to -- any
24  knowledge to dispute that, right?

44

1    Q.    So, do you recall having seizures in like
2  July and August of 2021?
3    A.    I mean, I'm sure I did.  I have them very
4  regularly.
5    Q.    Can you describe for me what you
6  experience when you have a seizure?
7    A.    I usually have mine in my sleep.  And
8  they are called -- I forget what they call them.
9  Like micro seizures or something.  I don't
10  remember what it's called.  But when I sleep or I
11  am falling asleep I have mini seizures.
12    Q.    Okay.  Do you -- so, when you say a mini
13  seizure, is it like your muscles seize up?
14    A.    Yes.
15    Q.    Do you lose consciousness?
16    A.    Yes.
17    Q.    Have you fallen?
18    A.    No.
19    Q.    Does it only happen when you are laying
20  in bed?
21    A.    It happens while I'm falling asleep and
22  when I fall asleep.
23    Q.    Have you ever hit your head?
24    A.    Yes.

45

1  Q.  Ever come out of seizures with bruises or
2  marks that you have hit yourself on the bed or
3  the wall?
4  A.  Yes.
5  Q.  When was the last time that happened?
6  A.  I have got bruises now.
7  Q.  Are they from seizures?
8  A.  Yes.
9  Q.  Okay.  Do you -- when you come out of the
10  seizure do you have any recollection of what
11  occurred during the seizure?  Are you cognizant
12  of it?
13  A.  I know what happened but like I don't
14  like know what happened.  I can just -- it's to
15  the point I have been doing this my whole life
16  where I can go right back to sleep.  I am just
17  groggy and feel foggy.  I took medications for it
18  for years, but I haven't taken meds in probably
19  since 2016.
20  Q.  Okay.  So, did you choose to not take
21  meds for it?
22  A.  Yes.
23  Q.  Why is that?
24  A.  The older I got -- I mean, now I only

46

1  have them in my sleep.  Like, I can deal with
2  that.
3  Q.  Okay.  So, you don't have any specific
4  recollection of having a seizure during the time
5  frame of July and August 2021 but you think you
6  probably did, is that right?
7  A.  Yeah.
8  Q.  So, we started talking about your injury
9  but I want to back up and can you tell me exactly
10  what happened on July 11, 2021 that resulted in
11  your ankle injury?
12  A.  I was playing soccer.  I got kicked in
13  the back of my leg.  And I fell like a sack of
14  rocks and had trouble getting up.  And I just
15  laid on the side of the soccer field until it was
16  time to go inside.  And my buddies helped carry
17  me in.  And I asked the CO if I could go to
18  Healthcare, and he told me to put in for nurse
19  sick call.  And that was that.
20  Q.  Okay.  What did it feel like when you
21  said you went down like a sack of rocks?
22  Can you describe the feeling when you got
23  kicked?
24  A.  Felt like a rubber band snapped in my

47

1  leg.  I mean, it hurt.  It hurt.
2  Q.  When you are laying on the ground, did
3  anybody try to get the attention of security
4  staff to say hey, he needs help?
5  A.  There's not really security staff walking
6  around in the yard.
7  Q.  Are they -- there's security staff
8  somewhere in the yard, right?
9  A.  I think they are in a little shack.  Is
10  there a shack on their yard?  I think there's a
11  shack.  But no, no one went and got them, no.
12  Q.  Okay.  Did you ask anybody to go get
13  help?
14  A.  No.  It was almost -- I knew yard was
15  about to be over with.  We were about to go in.
16  Q.  What did your ankle look like?
17  A.  I mean, it was purple and yellow for a
18  month and a half.
19  Q.  Let me back up.
20  So, the day it happened did it turn
21  purple immediately?
22  A.  Yeah.  Even my toes.  Even my toes turned
23  purple.
24  Q.  Just like the day it happened?

48

1  A.  I believe so, yes.
2  Q.  Your buddies helped you up and helped
3  you, but are you putting weight on it as you are
4  walking?
5  A.  No.
6  Q.  So, are you jumping on one foot?
7  A.  I'm using them as crutches.
8  Q.  But even using them as crutches, are you
9  putting that foot down --
10  A.  No.
11  Q.  -- as you walk?
12  A.  No.
13  Q.  Not at all?
14  A.  No.
15  Q.  And then you go back to the housing unit.
16  Do you put in a sick call slip right away?
17  A.  No.
18  Q.  Why not?
19  A.  Well, I know how much of a pain it is to
20  get over there in general because they always --
21  they are always short staffed and they never call
22  people on time.  And I know they were just going
23  to give me Tylenol, and I had Tylenol.  I thought
24  maybe if it would just get better on its own I

**49**

1  wouldn't need them.
2    Q.  You said you heard or felt a pop, right?
3  That like something snapped, is that -- was that
4  your testimony?
5    A.  Yes.
6    Q.  And you thought that that would just get
7  better on its own?
8    A.  I hoped. I can't rely on Danville's
9  healthcare.
10    Q.  When was the first time that you
11  submitted a slip for nurse sick call?
12    A.  Four days later.
13    Q.  So, on July 15th?
14    A.  Correct.
15    Q.  Did you see Dr. Ek like on the campus of
16  Danville during that time period?
17    A.  No.
18    Q.  So, you didn't ever interact with him,
19  pass him on yard?
20    A.  No.
21    Q.  Did you see any other healthcare staff
22  during that time period?
23    A.  Yes.
24    Q.  Who did you see?

**50**

1    A.  Alicia Pearson.
2    Q.  During the time period between July 11
3  and July 15th when you submitted the first sick
4  call slip?
5    A.  Oh, no.
6    Q.  Okay. Do you recall during that time
7  period did you go to yard?
8    A.  I don't think so, no.
9    Q.  Were you going to chow?
10    A.  Maybe.
11    Q.  Were you going to commissary?
12    A.  Maybe. I don't know.
13    Q.  Okay.
14    A.  I mean, you go a long time between
15  commissary, so --
16    Q.  So, you put in the slip on July 15. I
17  read your Complaint. You said you weren't seen.
18  When's the next time you submitted a slip?
19    You are reviewing your complaint now, is
20  that right?
21    A.  Correct.
22    Q.  So, you don't have an independent
23  recollection of this? You are relying on your
24  allegations in the Complaint, right?

**51**

1    A.  Yes.
2    Q.  Okay.
3    A.  I think the next time, if I'm not
4  mistaken, would be July 23rd.
5    Q.  Okay. So, you submit another slip on
6  July 23rd. Do you recall anything about your
7  activities between July 15th and July 23rd?
8    A.  Being in pain.
9    Q.  Do you recall --
10    A.  I had people calling. I went to the
11  healthcare Unit and got seen for a TB test and
12  tried to get help then.
13    Q.  Okay. And the date that you got the TB
14  test was July 21st of 2021, correct?
15    A.  Correct.
16    Q.  Describe that interaction.
17    First of all, like you are still
18  reviewing your Complaint here. Do you have an
19  independent recollection of this visit or are you
20  just relying on what's in your Complaint?
21    A.  I remember.
22    Q.  Okay. So, on July 21st, describe for
23  me -- you walked to Healthcare, right?
24    A.  Walked to Healthcare.

**52**

1    Q.  Were you weight bearing? Were you able
2  to put weight down on your right foot?
3    A.  I mean, I had to.
4    Q.  You didn't have inmates as crutches --
5    A.  No.
6    Q.  -- during that walk?
7    A.  No. My foot was so swollen I couldn't
8  wear a shoe though. I had a shower shoe on that
9  foot.
10    Q.  Okay. So, you walked to the Healthcare
11  Unit. And describe for me the interaction with
12  Healthcare.
13    Who do you see?
14    A.  Alicia Pearson.
15    Q.  Did you remember that it was Alicia
16  Pearson?
17    A.  Yes.
18    Q.  Your Complaint says unknown nurse, right?
19    A.  Yes. I didn't know her name.
20    Q.  So, how is it that you now say you knew
21  it was Alicia Pearson?
22    A.  Well, after I got her name, I mean,
23  that's -- the face goes with the name now.
24    Q.  So, your identification of her is based

53

1  on the fact that it's her name in the record or
2  based on the fact that we identified her in this
3  lawsuit?
4      A.  I gave my physical description of her and
5  in discovery you guys told me her name.
6      Q.  So, I mean, I will state to you that our
7  identification is based solely on the medical
8  record.
9          Do you -- so how about this.  You
10 describe for me what she looks like, the nurse
11 that you interacted with on July 21st.
12     A.  Heavyset, blond, glasses.
13     Q.  Older?  Younger?
14     A.  Probably my age.
15     Q.  What was that interaction?  Can you tell
16 me the discussion that happened with that nurse?
17     A.  I mean, there was a whole group of us
18 getting TB shots.  So, I waited my turn.  And
19 they -- we weren't even going all of the way
20 back.  She was just meeting you at the doorway,
21 sticking you, sending you out, like a cattle
22 line.  And when I got up there I was like, hey,
23 my foot is really messed up.  Like you can see
24 it's purple and I can't put a shoe on.  She said

54

1  sign up for nurse sick call.  I said I did sign
2  up for nurse sick call.  She said you will be
3  seen soon then.  We are short staffed.
4      Q.  So, the way you are describing it there's
5  a line of inmates, right?  There's a line of
6  other guys waiting for a TB test, right?
7      A.  (Indicating.)
8      Q.  Did she have any record or any paper in
9  front her when you had this conversation with
10 her?
11     A.  I don't recall.
12     Q.  Did you see anybody else in the
13 Healthcare Unit when you were there other than
14 the other guys waiting for the TB test?
15     A.  I don't recall.
16     Q.  Any other Healthcare staff that you can
17 recall?
18     A.  I mean, I didn't see them but I am sure
19 there was some there.
20     Q.  Did you have a sock on with your shower
21 shoe?
22     A.  No.
23     Q.  She advised you to sign up for sick call,
24 right?

55

1      A.  Yes.
2      Q.  According to your allegation then you
3  were seen two days later on the 23rd?
4          You are reviewing your Complaint to find
5  it, right?
6      A.  Yes.  I'm not seeing it.
7      Q.  So, in your allegations, if you have got
8  your Amended Complaint if you skip to page 22.
9      A.  Okay.
10     Q.  Paragraph 108 B you say:  On July 23rd,
11 2021 Plaintiff was seen by the same unknown nurse
12 to read his TB test.
13         Do you see that?
14     A.  Oh, yeah, yeah, I see it.
15     Q.  So, is it your recollection that you saw
16 Alicia Pearson?  You saw the same nurse, right?
17 That's your allegation?
18     A.  That's my allegation.
19     Q.  And do you have a recollection of seeing
20 the same nurse two days later?
21     A.  I know that the medical records show that
22 Kitwana Grant saw me, but I'm arguing and I know
23 that they are so short staffed there that they do
24 paperwork for each other.

56

1      Q.  So, it's your testimony that you didn't
2  actually see Kitwana Grant, that you actually saw
3  the same nurse, which would be Alicia Pearson?
4  Is that your testimony?
5      A.  Yes.
6      Q.  Why are you suing Kitwana Grant?
7      A.  Her name's on it.  I'm hoping to -- well,
8  discovery is not over.
9      Q.  So, because her name is on a piece of
10 paper, even though you insist that you saw
11 someone different, you are going to pursue a
12 claim against her anyway?
13     A.  Yes.
14     Q.  So, describe for me what you recall about
15 the interaction on July 23rd?
16         Do you have to review your Complaint to
17 recall?
18     A.  Yes.
19     Q.  So, as you sit here today you don't have
20 an independent recollection of that exchange,
21 right?
22     A.  I mean somewhat, but I mean Alicia
23 Pearson has always been dismissive.  It doesn't
24 matter if you are seeing her for nurse sick call

**57**

1  or TB test, she's just rude and dismissive.
2  Like, she is not a pleasant person.
3    Q.  So, Miss Pearson is just unpleasant, and
4  you don't really have a recollection of your
5  interactions with her in July of 2021 but she's
6  just always rude and dismissive, is that your
7  testimony?
8    A.  No.
9    Q.  Okay. I mean, can you tell me your
10  recollection of your interaction from July 23rd?
11    A.  Both times I saw her I asked her for help
12  and she kicked me to the side and gave me the
13  same spiel, sign up for nurse sick call.
14    Q.  But you don't really have a specific
15  recollection because you needed to review your
16  Complaint, right, to —
17    A.  I wanted to see if there was anything
18  else that I was forgetting.
19    Q.  That's July 23rd. When did you submit
20  your next sick call slip? You have not been seen
21  in sick call yet, correct?
22    A.  Correct.
23    Q.  When did you submit your next slip?
24      You are reviewing your Complaint again,

**58**

1  right?
2    A.  I am.
3    Q.  So, you don't have a recollection of
4  this, correct?
5    A.  No.
6    Q.  Okay. So, I know what your allegation
7  says in your Complaint. I don't need you to
8  recite that. I am here to find out what you
9  recall and what you remember about these events.
10    You are ultimately seen by a nurse at
11  nurse sick call on August 5th, correct?
12    A.  Correct.
13    Q.  And by Dr. Ek the same day, correct?
14    A.  Correct.
15    Q.  At any point between July 11 and
16  August 5th did you see Dr. Ek anywhere? Like run
17  into him in the Healthcare Unit or on yard?
18    A.  No.
19    Q.  At no point?
20    A.  No.
21    Q.  You didn't participate in any exercise
22  program on the yard?
23    A.  No.
24    Q.  Did you — you said you probably

**59**

1  continued to go to chow, right?
2    A.  Right.
3    Q.  And may have gone to commissary, correct?
4    A.  Right.
5    Q.  And if your Trust Fund Ledger shows that
6  you did go to commissary on July 22nd and again
7  on August 18, you would rely on those records to
8  show you walked to commissary, right?
9    A.  Sure.
10    Q.  Describe for me the visit with Dr. Ek on
11  August 5th.
12    A.  I saw the nurse first, and she —
13  normally you have to see a nurse three times to
14  be able to see a doctor. But she saw me and said
15  you need to see Dr. Ek. So, I went into his
16  office. And he told me — I mean my foot was
17  huge. It was swollen, it was changing colors
18  still. He asked me if I could lean forward
19  against the wall. I told him no. He just looked
20  at it, said yeah, I think you have got a
21  slightly – what's the words he used? I think
22  you have a small tear in your Achilles. I said,
23  well, you know, like my foot is huge and like my
24  toes are purple. He said, well, that's probably

**60**

1  from blood leaking out of the tendon getting into
2  your foot and changing the colors. I said, can I
3  get some crutches? He said, I don't think you
4  need any crutches. I said, Doc, I need crutches.
5  I can barely walk. I have been begging to get
6  over here all of this time. He agreed to put me
7  in for physical therapy, and he gave me some
8  Tylenol and maybe Naproxen, and sent me back to
9  the house on the second floor. Wouldn't give me
10  a bottom gallery permit.
11    Q.  You already had the low bunk permit,
12  right?
13    A.  Right.
14    Q.  You said he asked if you could lean
15  forward and touch the wall. Describe what you
16  mean by that.
17    A.  He wanted to know if I could stretch my
18  leg if I leaned forward. Like if I kept my feet
19  flat and try to touch the wall.
20    Q.  Okay. So he was assessing your ankle,
21  right?
22    A.  Yes.
23    Q.  Did he — he looked at it, right?
24    A.  Right.

61

1  Q.  Did he touch it, feel it?
2  A.  I don't remember.
3  Q.  And referred you for physical therapy and
4  for an ultrasound, right?
5  A.  Oh, yeah, ultrasound, yeah.
6  Q.  Did you have follow-up visits scheduled
7  in the Healthcare Unit after your visit with
8  Dr. Ek?
9  A.  I don't think so, no.
10  Q.  If the medical record shows that you had
11  a follow-up visit scheduled with a nurse and said
12  I don't need to see a nurse, I already saw the
13  doctor, would you dispute that that's accurate?
14  A.  Yeah.  Oh, I know what you are talking
15  about.  I know what you are talking about.
16      They finally were catching up to my nurse
17  sick call requests so they called me over, and I
18  was like, oh, I saw the doctor, I have got to
19  wait for my ultrasound.
20  Q.  So, you had additional opportunities to
21  see a nurse, right, and said I'm good, I saw the
22  doctor, right?
23  A.  I mean, yeah.
24  Q.  So, during the time period between seeing

62

1  Dr. Ek and going for the ultrasound or --
2  actually, did somebody come there to do the
3  ultrasound?
4  A.  Somebody came there.
5  Q.  Okay.  So, they do the ultrasound on site
6  there at Danville.  Between that time period are
7  you going to yard, between seeing Dr. Ek and
8  getting the ultrasound?
9  A.  I don't recall.
10  Q.  Were you going to chow?
11  A.  Probably.
12  Q.  Actually one of the commissary visits
13  that I just listed from August 18, you went to
14  commissary, right?
15  A.  Yes.
16  Q.  You had the ultrasound.  It shows a tear
17  in the tendon, in your Achilles tendon.  That
18  ultrasound is on August 31st, correct?
19  A.  Yep.
20  Q.  And when they -- so the results come back
21  to the facility and you got called over on
22  September 3rd, correct?
23  A.  Correct.
24  Q.  And you were -- from September 3rd on you

63

1  were admitted to the Infirmary, correct?
2  A.  Correct.
3  Q.  Dr. Ek ordered non weight-bearing, right?
4  A.  Yep.
5  Q.  Were you in a splint?
6  A.  Yep.
7  Q.  Some sort of boot?
8  A.  Yep, splint.
9  Q.  It was a splint?
10  A.  Yep.
11  Q.  Describe for me what that looked like.
12  A.  It looked like half of a hard cast.
13  Q.  Half of a hard cast.  So, was the hard
14  part on the heel part of your foot or was the
15  hard part on the top part of your foot?
16  A.  The heel part.
17  Q.  And then there was straps that went over?
18  A.  Like Ace bandage.
19  Q.  Okay.  How was your foot positioned in
20  the splint?
21  A.  90 degree angle.
22  Q.  Okay.  But since it's hard it's
23  immobilized, right?  You are not able to flex it
24  or straighten it?

64

1  A.  Correct.
2  Q.  Were you given a wheelchair or crutches
3  at that point?
4  A.  Yes.
5  Q.  And you had medication, correct?  Pain
6  medication?
7  A.  Tylenol, Naproxen, yes.
8  Q.  And did Dr. Ek refer you to the
9  orthopedist?
10  A.  I mean, I know he did.  I don't know when
11  he did, but yes, he sent me to an orthopedic.
12  Q.  You remained in the Infirmary, you were
13  housed in the Infirmary until after your surgery,
14  right?
15  A.  Right.
16  Q.  And while you are in the Infirmary do you
17  have access to nursing staff 24/7?
18  A.  Yes.
19  Q.  Did you get regular visits from Dr. Ek
20  during that time period?
21  A.  Saw him a couple of times.
22  Q.  Weekly?
23  A.  That might be right.
24  Q.  Do you recall getting an MRI on

65

1  October 7, 2021?
2     A.   Sounds right.
3     Q.   You saw the orthopedist on October 15,
4  2021?
5     A.   Yes.
6     Q.   And ultimately the orthopedist
7  recommended a surgical repair, right?
8     A.   Yes.
9     Q.   And you got the surgical repair in
10  January of 2022, correct?
11    A.   Yes.  I had a tendon transfer.
12    Q.   Okay.  While you were in the Infirmary
13  you also complained of muscle cramps, right?
14    A.   Yes.
15    Q.   And Dr. Ek -- did Dr. Ek give you
16  something for that?
17    A.   Potassium and -- that might be it.  He
18  gave me something, yeah.
19    Q.   Do you remember getting a prescription
20  for Robaxin?
21    A.   Oh, yeah, yeah, Robaxin.
22    Q.   I saw a note December 22nd, 2021 you
23  complained that you threw your back out.  Do you
24  recall that?

66

1     A.   Yeah.
2     Q.   How did you throw your back out?
3     A.   I was in my wheelchair and I was coming
4  up to a doorjamb, and I grabbed both sides and
5  tried to roll myself through it and out she went.
6     Q.   Dr. Ek gave you a Toradol injection.  Do
7  you recall that?
8     A.   Yes.
9     Q.   After the surgery you came back and you
10  remained in the Infirmary, right, for recovery
11  from the surgery?
12    A.   Yep.
13    Q.   Dr. Ek prescribed Norco when you came
14  back, right?
15    A.   Yeah.
16    Q.   And when you complained -- so, the
17  initial prescription was for seven days, and at
18  the end of seven days when you complained that
19  you were still in pain he extended it, is that
20  right?  Do you recall that?
21    A.   Yes, yes.
22    Q.   In March you remained in the Infirmary,
23  and then in March you went back to the ortho.  Do
24  you recall that?

67

1     A.   Yes.
2     Q.   And at that point you were released and
3  discharged from the Infirmary?
4     A.   It might have been even after that.  I
5  asked to go back to population.
6     Q.   Why did you ask to go back to population?
7     A.   Healthcare Unit over there is real
8  depressing.  A lot of people dying and sick.  For
9  my mental health I wanted to get out of there.
10    Q.   Okay.  You wouldn't have asked to go back
11  if you didn't think that you were healthy enough,
12  right?
13    A.   I was good enough to go back.  I mean, my
14  leg's always going to hurt.  It's not going to --
15  it's not like it was when I first did it but I
16  mean --
17    Q.   The orthopedist recommended physical
18  therapy, correct?
19    A.   Correct.
20    Q.   And you went out for physical therapy and
21  were given home exercises.  Do you recall that?
22    A.   Yes.
23    Q.   And do you recall what those exercises
24  were?

68

1     A.   Mostly rubber band stretches and just toe
2  raises.  I still do them.
3     Q.   You do still do them.
4           Did you do them consistently from the
5  time you received the instruction?
6     A.   When I wake up in the morning my leg is
7  so stiff I can't even walk before I do a couple
8  of toe raises and stretch it out.  Like to this
9  day I just got put on Lidocaine patches and
10  Voltaren cream because it still causes my
11  trouble.  I am going to send that as well when I
12  get those records.  They should be getting to me
13  any day.
14    Q.   Okay.  So, these would be updated medical
15  records from East Moline?
16    A.   Yes.
17    Q.   So, we have talked -- we talked about how
18  you weren't able to go to yard after -- or you
19  know, really walk after your September -- or
20  excuse me, your July 11th injury.  I'm going to
21  share my screen and I am going to mark this as
22  Exhibit 2.
23
24

69

1           (Whereupon Deposition
2           Exhibit No. 2 was marked
3           for identification.)
4
5   BY MS. SYRCLE:
6       Q.    Can you see an Offender Grievance on your
7   screen?
8       A.    Yes.
9       Q.    This has a date stamp over the top of it,
10  but I think -- did you see -- well first of all,
11  this is Lucas Wood and your IDOC number, is that
12  right?
13      A.    Yes.
14      Q.    The date stamp is July 26 of 2021.  It
15  looks to me like underneath it is your
16  handwritten July 23rd.  Did you see that?
17      A.    Yes.
18      Q.    And is this your handwriting?
19      A.    Yes.
20      Q.    If we scroll down it says:  On July 23rd,
21  2021 at 12:00 p.m. we on 3B were notified that
22  yard will be canceled at 1:00 p.m. due to heat.
23  It is 84 degrees and beautiful outside.  It is
24  not dangerous temperature for us to have yard.

70

1   If the -- does this say COs?
2       A.    Yes.
3       Q.    Or Sergeants, is that what that says?
4       A.    Yeah.
5       Q.    Don't like to be outside, then they
6   should find another place to work.  We only get
7   two to three recreation times a week, and to
8   cancel it on such a beautiful day is ridiculous.
9           Did I read that correctly?
10      A.    Yeah.
11      Q.    Okay.  So, on July 23rd, you are angry
12  that you are not getting to go to yard, right?
13      A.    Yep.
14      Q.    Okay.  So, we have talked a fair amount
15  about Dr. Ek, and I think at this point we have
16  covered the nurses.
17          You have also sued Wexford Health
18  Sources.  If we look at your Complaint --
19  actually, I will go ahead and mark that as
20  Exhibit 3.
21
22
23
24

71

1           (Whereupon Deposition
2           Exhibit No. 3 was marked
3           for identification.)
4
5   BY MS. SYRCLE:
6       Q.    I'm going to share my screen.
7           Do you see a document on the screen that
8   is your Amended Complaint filed in this case?
9       A.    Yes.
10      Q.    It was filed November -- the 4th of
11  November in 2022, is that right?
12      A.    Yes.
13      Q.    And during that, on that date you would
14  have been housed in the Infirmary waiting for
15  your follow-up with the orthopedist, right?
16      A.    Yes.
17      Q.    Okay.  If we scroll down, you have got
18  some allegations here.
19      A.    Wait, November?  I think I was already
20  back in population by then.  Of --
21      Q.    Of '22.
22      A.    Yeah.
23      Q.    Good catch.  Sorry.  I had November of
24  '21 in my head when I asked that question.  You

72

1   are correct.
2           You were -- you had already had your
3   surgery at that point?
4       A.    Yes.
5       Q.    So, at the time you filed this suit you
6   had actually already had the surgery and were
7   back in general population when you filed the
8   Amended Complaint, is that right?
9       A.    Yes.
10      Q.    Thank you for that clarification because
11  I screwed up the year.
12          So, paragraph 85 of your Amended
13  Complaint says:  Based on information and belief,
14  IDOC's contract with Wexford is a flat fee basis
15  and includes financial incentives that encourage
16  Wexford to reduce patient referrals and
17  hospitalization of prisoners in outside
18  facilities.
19          Did I read that correctly?
20      A.    Yes.
21      Q.    Upon what information is that based?
22      A.    Articles that have been done on Wexford
23  and Lippert report.
24      Q.    Do you think somewhere in the Lippert

73

1  report it says that the Wexford contract is a
2  flat fee?
3      A.   I don't know.
4      Q.   Anything else?
5      A.   No.
6      Q.   You say in paragraph 88:  Based on
7  information and belief, Wexford implemented cost
8  saving policies of collegial review of referrals,
9  delaying or failing to refer prisoners to outside
10  specialists and diagnostic evaluations,
11  understaffing, inadequate medical training, and
12  failure to respond to sick call requests and
13  grievances.
14          Did I read that correctly?
15      A.   Yes.
16      Q.   Do you have any evidence that any of your
17  referrals went through collegial review?
18      A.   I'm not sure.
19      Q.   Do you have any evidence that any outside
20  referral for you was delayed by anything Wexford
21  did?
22      A.   I mean, I have the words from my surgeons
23  that I should have been brought in sooner.
24      Q.   Do you think the timing -- do you have

74

1  any evidence that shows the timing in which the
2  outside specialist got you in from the time the
3  referral was made?
4      A.   Can you rephrase that?
5      Q.   Do you know how much time it took for
6  that outside specialist to see you after Dr. Ek
7  made the referral?
8      A.   I'm not 100 percent sure.  I'm sure I
9  could figure it out.
10      Q.   Okay.
11      A.   I know the surgeon told me that if I
12  would have been brought in right away that he
13  could have just reattached it and wouldn't have
14  had to transfer tendons.
15      Q.   Did the surgeon tell you what he meant by
16  right away?
17      A.   Well, not months later probably.
18      Q.   Did the surgeon indicate whether five
19  days or a week later would have been the same
20  outcome?
21      A.   He didn't, but I'm going to subpoena him
22  as a witness.
23      Q.   Do you have -- do you have any other
24  evidence of any Wexford policy or widespread

75

1  practice that we haven't talked about in this
2  allegation?
3      A.   I have the e-mail from Jennifer Chicone
4  to Diana Fischer in Springfield saying that they
5  were understaffed and that's why they couldn't
6  get me over there as fast as they are supposed
7  to.
8      Q.   Do you have any evidence of why they were
9  understaffed?
10      A.   I don't know.  But I also have all of the
11  positions that were open at that time at
12  Danville.
13      Q.   How do you know how many positions were
14  open?
15      A.   Freedom of Information.  And the Lippert
16  report did it on Danville.  I mean part of their
17  study was on Danville that showed -- I believe
18  that I sent that to you.
19      Q.   So, it shows that they had opened -- that
20  there are nursing positions that aren't filled,
21  is that what it shows?
22      A.   Yes.  And the e-mail shows exactly how
23  many people they were short.  Like five LPNs and
24  three R.N.s or something sort of like that.

76

1      Q.   Okay.  So, do you know what Wexford was
2  doing to fill those positions?
3      A.   I don't know.
4      Q.   So, you have no information that Wexford
5  was choosing not to fill those positions, right?
6      A.   It was still a practice of being short
7  staffed if you ask me.
8      Q.   Even if there's active searches that
9  aren't coming up with individuals to fill those
10  spots?
11      A.   I mean, if you can't have enough people
12  to operate the prison you shouldn't be running
13  the prison.
14      Q.   Okay.  You don't have any information
15  about shortages of healthcare staff outside the
16  prison, right?
17      A.   They don't have a federal right to
18  healthcare.  I do.
19      Q.   Okay.  So, people in the community
20  aren't -- do not have the same entitlement to
21  healthcare that you do?
22      A.   No.
23      Q.   Okay.  You mentioned that you are going
24  to subpoena the orthopedist.  Is that Dr. Meeker?

77

1  A.  Yes.
2  Q.  Have you talked to him about testifying?
3  A.  I believe my previous counsel did.
4  Q.  Okay. Do you -- is that based -- I'm not
5  going to ask that.
6      You personally have not talked with
7  Dr. Meeker about testifying on your behalf,
8  right?
9  A.  I have not yet, no.
10 Q.  You list Elizabeth Lansen as a witness in
11 your interrogatory responses. Do you recall
12 listing her?
13 A.  Yes.
14 Q.  Who is Elizabeth Lansen?
15 A.  She's a friend.
16 Q.  She's a friend in the community?
17 A.  Yeah.
18 Q.  And what's the basis of Elizabeth
19 Lansen's knowledge? How does she know?
20 A.  She's the one that called and spoke with
21 Jennifer Chicone on two occasions and was like
22 letting people know that I was hurting and not
23 being seen.
24 Q.  Did she visit you during that time

78

1  period?
2  A.  Yes.
3  Q.  What date did she visit you?
4  A.  I don't recall the dates.
5  Q.  Okay.
6  A.  I remember rolling up there in a
7  wheelchair a couple of times.
8  Q.  So if you were in a wheelchair when you
9  visited with her, that was after you were
10 admitted into the Infirmary, right?
11 A.  Yeah.
12 Q.  Prior to that do you remember visiting
13 her? During -- between --
14 A.  You know what, I'm not 100 percent sure,
15 no. I don't -- maybe.
16 Q.  Any other basis for Miss Lansen's
17 knowledge?
18 A.  I mean, I spoke to her every day. I
19 mean, she heard me complaining. That's about it.
20 Q.  You also list -- in your interrogatories
21 you list Kitwana Grant as a witness.
22     Do you recall listing her?
23 A.  I don't remember that, but I liked
24 Kitwana. She liked her -- she was one of the

79

1  nurses there that actually liked her job and -- I
2  hate that I had to bring her into this. I would
3  like to get her out of it.
4  Q.  You understand that that's within your
5  power, right?
6  A.  Yeah.
7  Q.  You hate to get her into this. You can
8  dismiss her.
9  A.  I need her to admit to a few things for
10 me.
11 Q.  So, you have sued her to get her
12 testimony?
13 A.  I mean, I -- maybe. I guess.
14 Q.  Okay. In your Complaint you list amounts
15 of damages that you are seeking.
16     Are those -- so, I can pull it back up.
17 It's already marked as Exhibit 3. I'm going to
18 share my screen.
19     Do you see the Relief Requested portion
20 of your Amended Complaint on the screen? It's
21 page 29.
22 A.  I do.
23 Q.  And you list amounts here. You are
24 seeking $800,000 jointly and severally for

80

1  physical and emotional injuries, 200,000 jointly
2  and severally for pain and suffering and
3  diminished quality of life, and then punitive
4  damages.
5      Are these amounts based on any sort of
6  mathematical calculation or any determination
7  that you have made as to the value of your
8  injuries?
9  A.  I mean, I'm a barber out there, and I'll
10 never be able to stand on my feet 12 hours a day
11 again. I'll never get to -- you know, I have
12 gained 60 pounds from being in that wheelchair
13 that I will never lose. I can never play sports
14 again. Like that's everything I love is cutting
15 hair and sports, and I can't do any of it
16 anymore.
17 Q.  Do you have any medical evidence that
18 that is due to a delay caused by one of the
19 defendants as opposed to your original injury?
20 A.  You can word it however you want. You
21 know it was a long delay. It would have been one
22 thing if it took me a week to get over there
23 and get me some help. It took almost a month.
24 And then after that you wouldn't even give me

E-FILED
Monday, 11 November, 2024  04:06:39 PM
Clerk, U.S. District Court, ILCD

81

1  crutches or a splint.  I mean --
2    Q.   I mean, do you have medical evidence that
3  any of these damages are from that delay as
4  opposed to your original injury?
5    A.   I mean, we are going to get the surgeon's
6  testimony.
7    Q.   He hasn't told you that to this point,
8  right?
9    A.   He spoke with Ethan.
10   Q.   Okay.  I'm going to stop sharing my
11  screen, and I think that's it for me.
12         Mr. Watkiss likely has some questions.
13         MR. WATKISS:   I'm ready to go ahead.
14  I don't have that much.  So, if everybody is
15  good, I'll just go ahead.
16         Is that all right?
17         MS. SYRCLE:  Yes.
18
19         CROSS EXAMINATION
20  BY MR. WATKISS:
21   Q.   Mr. Wood, you and I have something in
22  common.  And actually I did you better than you
23  did.  I have ruptured both of my Achilles playing
24  basketball.  So, I am rather familiar with this

83

1  limping, or what were you doing.
2    A.   I don't think I went anywhere for the
3  first couple of days.  But after that, yeah, I
4  had to hobble.  I had to make do.  No one would
5  help me.
6    Q.   Now I want to ask you about Jennifer
7  Chicone, because she's the one I represent.
8         Did you ever speak to her directly about
9  your injury that you suffered in this case?
10   A.   She answered all of my grievances.
11   Q.   Okay.  But did you ever speak to her
12  either in person or on the phone or -- in person
13  or on the phone, did you ever speak to her?
14   A.   No.
15   Q.   All right.  So, the communication you had
16  with her would have been what communication?
17   A.   Elizabeth Lansen calling her and letting
18  her know.  And I sent her certified mail that she
19  signed for.  I have the return receipts.  And my
20  inmate grievances.
21   Q.   Okay.  Let's talk about those three
22  things.
23         First of all let's start with the
24  grievances.

82

1  injury.
2         Let me ask you this.  After you were
3  kicked in the back of the leg did your calf roll
4  up behind your knee at all?
5    A.   I'm unsure.  I don't recall that.
6    Q.   It would be very apparent if it did.  You
7  would have a ball of flesh up back behind your
8  knee, behind your kneecap.  It strikes me that
9  didn't happen to you.
10   A.   No.
11   Q.   Okay.  Did you feel pain immediately
12  after you got kicked in the leg?
13   A.   Yes.
14   Q.   When you were taken off of the yard, you
15  are unable to walk, you can't weight bear on that
16  leg, correct?
17   A.   Correct.
18   Q.   So, what did you do after, you know, you
19  got back to your housing unit and for the days
20  and week after that?  How were you able to
21  ambulate on your right leg?
22   A.   I had no choice.  I mean, it hurt.  It
23  still hurts.  Not like it did.
24   Q.   Were you putting weight on it, were you

84

1         Did you prepare some type of grievance
2  that Jennifer Chicone would have looked at?
3    A.   She answers all the medical grievances.
4    Q.   Can you tell me when that grievance or
5  how many grievances you submitted that Jennifer
6  Chicone would have responded to?
7    A.   There's four in this Complaint.
8    Q.   Okay.  Can you give me the paragraphs
9  where they are at in the Complaint?
10   A.   Paragraph 25.
11   Q.   Hold on, let me get there.  Paragraph 25.
12  All right.
13         So, that references some type of
14  emergency grievance, and then you also relate
15  that to Exhibit 1., is that correct?
16   A.   Correct.
17   Q.   All right.  So, that's the first one.
18         Where's the next one?
19   A.   Paragraph 49.
20   Q.   All right.  Paragraph 49 then references
21  Exhibit 2, correct?
22   A.   Correct.
23   Q.   Okay.  And then the next one?
24   A.   Paragraph 59.

85

1    Q.   Okay.  Paragraph 59, which then
2   references your Exhibit 3, correct?
3    A.   Correct.
4    Q.   All right.  And then lastly there was a
5   fourth one?
6    A.   I'm not -- I might have skipped over it
7   but I think -- hold on.  Let me look here.
8   Exhibit 2 is two different grievances.
9    Q.   Okay.  I see.  So, there's a grievance
10   6559 and 6651, correct?
11    A.   Correct.
12    Q.   So, the four grievances would be
13   Exhibit 1 is 6432, Exhibit 2 is 6559 and 6651,
14   and Exhibit 3 is 6693, correct?
15    A.   Correct.
16    Q.   Okay.  So, those would have been the four
17   grievances that you would have made as a result
18   of the injury that you suffered and any follow-up
19   treatment, correct?
20    A.   Correct.
21    Q.   All right.  And in each of those four
22   cases did Jennifer Chicone respond to those
23   grievances?
24    A.   Yeah.  She denied them all.

86

1    Q.   Okay.  And what's your understanding of
2   her role with regard to a grievance?
3      Does she make that decision solely
4   herself?
5    A.   Let me see what her job title and
6   responsibilities -- her job is to ensure staffing
7   levels are adequate, monitor healthcare services
8   provided to individuals in custody at offsite
9   healthcare facilities, monitor corrective action
10   plans and follow-ups, adjust first level
11   grievances.
12    Q.   Okay.  That you are reading is from that
13   FOIA request that you made that sets forth what
14   the job duties would be for a Healthcare Unit
15   Administrator such as Jennifer Chicone, correct?
16    A.   Yeah, her specifically.  It's got all of
17   her information in here.
18    Q.   Okay.  With regard to that first
19   grievance, 6432, you said she denied it.  What
20   did you mean by that?
21    A.   Let's look at it.  She said it was moot.
22    Q.   Okay.  Where are you getting that from?
23    A.   Exhibit 1.
24    Q.   I think I have Exhibit 1 in front of me.

87

1    A.   Like four or five pages long.
2    Q.   All right.  Exhibit 1, I have one, two,
3   three -- all right.  I show Exhibit 1 is a total
4   of six pages.  Is it the fourth page in that's
5   where it says:  Grievance 6432, medical sick call
6   denial has been completed by the CAO moot.
7   Grievance has been returned to the individual in
8   custody?
9    A.   Yeah.
10    Q.   And it's your understanding that that
11   decision was made by Jennifer Chicone?
12    A.   I mean, I don't think that the Warden is
13   going to make health decisions without her
14   recommendation.
15    Q.   I don't see her name anywhere on that
16   page where it says it's moot, so why do you
17   attribute that decision to her?
18    A.   I'm not sure why her name isn't on -- she
19   just -- I know the next grievance she signed.
20   That was her job.  I mean, that's her job
21   responsibility is first level healthcare
22   grievances.
23    Q.   Okay.  So, based upon that you believe
24   that she would have been the one that would have

88

1   made the decision that this first grievance was
2   somehow moot, correct?
3    A.   Correct.
4    Q.   Okay.  With regard to this first
5   grievance, was there any type of hearing where
6   you would have testified or spoken to her in
7   person?
8    A.   No.
9    Q.   So, the grievance is all done through
10   documentation, correct?
11    A.   Correct.
12    Q.   All right.  And you are operating under
13   the assumption that she would have read whatever
14   your grievance was and that's how she would have
15   been familiar with whatever your complaint is,
16   correct?
17    A.   Yes.
18    Q.   All right.  And then at least with regard
19   to this first grievance, 6432, you are assuming
20   that it was Jennifer Chicone that made that
21   decision based on her job title and the job
22   responsibilities that you have rather than
23   anything in the documents itself that lists her
24   by name, correct?

89

1    A.    Correct.
2    Q.    Okay. So, now Exhibit Number 2 is -- you
3  said there were actually two grievances. 6559 is
4  the next one, correct?
5    A.    Yes.
6    Q.    All right. And do you believe Jennifer
7  Chicone then made a decision on this second
8  grievance?
9    A.    It looks like she read my Offender
10  Progress Notes and my medical record and made her
11  decision off of that without speaking to anybody.
12  That's my opinion.
13    Q.    All right. Where are you getting that?
14  Based on what? Are you looking at a document
15  that --
16    A.    Her response to grievance number 6559.
17    Q.    Okay. Where is that response?
18    A.    Very bottom of the front page.
19    Q.    Is that where it's under the heading
20  Counselors' Response?
21    A.    Yes. That's Jennifer Chicone's response.
22    Q.    Counselor's response it says 9/1/21 date
23  received, is that what you are talking about?
24    A.    Yeah.

90

1    Q.    And on the first line I show says:
2  Referred to healthcare.
3    A.    Yep.
4    Q.    It says: Per medical record review the
5  first note in the chart after 7/15/21 is on
6  7/21/21 when the patient was brought to the HCU
7  for TB test which was read two days later on
8  7/23. No mention of Achilles injury. On
9  7/29 and 8/3 there are notes in the chart that
10  patient was not seen in NSC due to time
11  constraints.
12    And then there is probably one more
13  sentence that I can't read it. Mine is cut off.
14    But is that the response that you are
15  talking about?
16    A.    I can continue reading if you would like
17  but --
18    Q.    Yes. What is the next sentence?
19    A.    Patient seen on 8/5 by Dr. Ek who ordered
20  an ultrasound and pain medication on 3/7. NSC
21  notes that patient had no need. On 8/11 the
22  nurse charted that patient did not get a call
23  pass and was not seen. 8/16 patient referred
24  nurse sick call because he had been seen by the

91

1  doctor. Ultrasound 8/31. 9/3 ultrasound results
2  available. M.D. had patient brought to the
3  Infirmary. And then it has Jennifer Chicone's
4  signature.
5    Q.    That's what I was going to ask you. At
6  the end that it has her signature?
7    A.    Says J. Chicone, HCUA.
8    Q.    And then the next one is 6651, correct?
9    A.    Correct.
10    Q.    All right. And now the page I'm looking
11  at, at the bottom there where it would have said
12  Counselor's Response it says: See grievance
13  6559.
14    Do you see that?
15    A.    Yep.
16    Q.    Would that have been Jennifer Chicone's
17  handwriting?
18    A.    Yes.
19    Q.    Is there anything else in this second --
20  I'm sorry, this would be the now third
21  grievance -- with her name on it anywhere?
22    A.    Yep. At the bottom of grievance number
23  6693 her name and HCUA.
24    Q.    Okay. 6693 is the fourth one. I'm still

92

1  looking at the third one, 6651.
2    It looks like she treated 6559 and 6551
3  as together, as being one grievance, because her
4  response to 6651 is to say see grievance 6559.
5    Would you agree with me on that?
6    A.    Yes. She blew this grievance off.
7    Q.    All right. Well, I'll object to that
8  response.
9    It says: See grievance 6559.
10    You believe that is Jennifer Chicone's
11  handwriting?
12    A.    I do.
13    Q.    Do you see her name anywhere on grievance
14  6651?
15    A.    No.
16    Q.    Okay. And then lastly we have 6693.
17    A.    Oh, her name is on the third page.
18    Q.    Right. That third page references
19  grievance 6559, does it not, in the upper
20  right-hand corner?
21    A.    (Indicating.)
22    Q.    And the other one, 6651, they are both up
23  there, correct?
24    A.    Correct.

93

1    Q.    Okay. I see it now.
2          Lastly, grievance 6693, which is your
3    Exhibit 3, correct?
4    A.    Correct.
5    Q.    Again, do you believe then her --
6    Jennifer's response would have been down at the
7    bottom as the Counselor's Response 9/20/21?
8    A.    Yes, that's her signature.
9    Q.    Mine is cut off as well. The paragraph I
10   see, as much as I can read, it starts with:
11   Please see grievance number 6559.
12         Do you see that?
13   A.    I do.
14   Q.    Okay. And then for me it ends where it
15   says -- sort of says: Seen in orthopedic
16   specialist at Carle on October something -- I
17   can't read that. And had -- can you read beyond
18   that point where that sentence where it says
19   orthopedic specialist at Carle?
20   A.    MRI at Carle. Surgical repair of the
21   Achilles tear has been planned.
22         And then if you see right here, that's
23   her signature.
24   Q.    Okay. Yes, I do see that. Very well. I

94

1    am going to have to try to get better documents
2    here. Okay. All right.
3          So, the first type of communication that
4    you would have had with Jennifer Chicone would
5    have been these four grievances where she would
6    have responded to you in writing, correct?
7    A.    Correct.
8    Q.    Now, you said you also sent her a letter?
9    A.    I did.
10   Q.    When did you send her a letter?
11   A.    I will have to go find them. I have not
12   entered them into discovery. I actually just
13   found them the other day.
14   Q.    All right. So, the letter that you sent
15   you haven't produced to us yet in discovery,
16   correct?
17   A.    Yeah, no.
18   Q.    All right. Do you have the letter in
19   front of you there?
20   A.    No, I don't have a copy of the letter. I
21   have the little green return signature thing from
22   her return.
23   Q.    So, you sent it certified mail?
24   A.    Yes.

95

1    Q.    Can you tell me what the certified mail
2    on the green card, what date it would have
3    indicated it was mailed to her?
4    A.    I don't have that in front of me.
5    Q.    Okay. Do you know if in fact she was the
6    one that signed for it? Because sometimes when
7    they deliver something anybody signs.
8    A.    I will have to take a look and see.
9    Q.    Okay. So, as you sit here right now you
10   sent this letter, you got back a green card, but
11   you can't testify that she in fact actually
12   received the letter herself or that she actually
13   read it, correct?
14   A.    Correct.
15   Q.    Okay. So, there were grievances, a
16   letter you sent. The third type of communication
17   then would have been your friend Elizabeth Lansen
18   apparently calling and speaking to Jennifer
19   Chicone on two occasions it would appear, is that
20   right?
21   A.    Correct.
22   Q.    All right. And that is -- let's see.
23   A.    Exhibit 9.
24   Q.    That is your Exhibit 9.

96

1          Is that an Affidavit that you put
2    together for her to sign?
3    A.    It is.
4    Q.    Okay. You weren't a party to any of
5    those telephone conversations between Elizabeth
6    Lansen and Jennifer Chicone, correct?
7    A.    No, but Jennifer Chicone admitted to one
8    of them in her interrogatories.
9    Q.    Okay. My question though is -- I don't
10   dispute that the conversations or the phone calls
11   took place. The first thing I want to make sure
12   I understand is that you weren't on the phone, it
13   wasn't a three party call, is that correct?
14   A.    Correct.
15   Q.    All right. So, the first phone call that
16   Elizabeth Lansen would have made to Jennifer
17   Chicone would have been July 21st, '21, is that
18   correct?
19   A.    Correct.
20   Q.    All right. And then the information that
21   you have about what Elizabeth Lansen may have
22   said to Jennifer Chicone is based on what
23   Elizabeth Lansen told you, correct?
24   A.    Correct.

97

1    Q.    So, Jennifer said to you, I called up --
2    strike that.
3          Elizabeth called you on the telephone and
4    told you that she had spoken to Jennifer Chicone
5    on the phone and then Elizabeth told you what she
6    said to Jennifer Chicone, correct?
7    A.    I called her and had that same
8    conversation, yes.
9    Q.    All right.  So, you called Elizabeth to
10   ask about the conversation she had with Jennifer
11   Chicone, correct?
12   A.    Correct.
13   Q.    And then Elizabeth told you what she told
14   Jennifer Chicone?
15   A.    Correct.
16   Q.    And then based upon your understanding of
17   that you then put this Affidavit together with
18   regard to what the contents of the July 21st,
19   '21 telephone conversation with Jennifer Chicone
20   would have been, correct?
21   A.    And the August 3rd, yes.
22   Q.    We will get to that one next.
23         With regard to the August 3rd,
24   '21 telephone conversation that Elizabeth would

98

1    have had with Jennifer Chicone, once again did
2    you call Elizabeth to ask her about that
3    conversation?
4    A.    Yes.
5    Q.    Okay.  And then it was the same,
6    essentially the same where Elizabeth told you
7    what she then told Jennifer Chicone in that
8    second conversation of August 3rd, 2021, correct?
9    A.    Correct.
10   Q.    You have never spoken to Jennifer Chicone
11   on the phone yourself directly, have you?
12   A.    No.
13   Q.    And then other than Elizabeth Lansen
14   talking to Jennifer Chicone on the telephone on
15   those two occasions, July 21, 2021 and
16   August 3rd, 2021, did you ever have anyone else
17   call over and speak to Jennifer Chicone on your
18   behalf?
19   A.    I did not.
20   Q.    Okay.  So, we have the grievances that
21   you filed, you sent the letter, the phone calls.
22   Was there anything else, any other form of any
23   communication from your end to Jennifer Chicone?
24   A.    No.

99

1    Q.    All right.  The only other thing that I
2    recall you have is you have some type mail from
3    Jennifer Chicone, correct?
4    A.    Correct.
5    Q.    All right.  And how did you obtain that
6    e-mail?
7    A.    You sent it to me in discovery.
8    Q.    That was something I produced to you.
9    Can you tell me the Bates number of that e-mail?
10   It will have an IDOC number like the one we saw
11   earlier.  IDOC 94 I believe was one of our
12   exhibits.
13   A.    I don't have it on me.
14   Q.    Okay.  But your understanding in reading
15   that e-mail was that she referenced Danville's
16   Healthcare Unit being understaffed, correct?
17   A.    Correct.
18   Q.    When this was happening -- you suffered
19   your injury in, what, July of 2021.  Was COVID
20   protocol still in place at the correctional
21   center in Danville?
22   A.    Yes.
23   Q.    Okay.  And as you sit there now, you
24   don't have any personal knowledge as to what

100

1    efforts were made by anyone to try the fill those
2    positions, correct?
3    A.    Correct.
4    Q.    And it wouldn't be surprising to you,
5    would it, if they tried to fill the nursing
6    positions and no one wanted to work in a
7    penitentiary during COVID?
8    A.    Then you are in the wrong business.
9    Q.    They can't force people to go work there,
10   can they?
11   A.    Well, they can stop working there and let
12   the National Guard take over.
13   Q.    Well, you really think the National Guard
14   is going to come in and do healthcare?
15   A.    Yeah.
16   Q.    Really?  So, you understand --
17   A.    They are the ones that want to do this
18   contract.  They just renewed their contract again
19   and they are still short staffed.
20   Q.    I don't mean to argue with you, but if
21   they make efforts to try to fill the position and
22   no one wants to take the position, what are they
23   supposed to do about that?
24   A.    Do a better job of triaging their nurse

101

1   sick call slips.
2       Q.   With the people they have?
3       A.   With the people they have.
4       Q.   So in reading -- and then I guess let me
5   ask you this. Your understanding of Jennifer
6   Chicone's job duties, in reading that it strikes
7   me that she's an administrator. Would you agree
8   with that?
9       A.   Yes.
10      Q.   She doesn't actually see any inmate to
11  provide healthcare, correct?
12      A.   Correct. She overseas the people that
13  do.
14      Q.   Okay. She didn't see you in this case to
15  provide you any treatment, correct?
16      A.   Correct.
17      Q.   And as you said, it's your understanding
18  that wouldn't be her job duty, correct?
19      A.   Correct.
20      Q.   All right. So, why did you sue her?
21  What did she do that caused you to suffer the
22  injuries that you have or had or the delay in the
23  treatment?
24           Tell me about what she did.

102

1       A.   She -- her number one job responsibility
2   is to ensure staffing levels are adequate for
3   daily operation at needs and patient care.
4       Q.   All right. And would you agree with me
5   if she made those efforts to do that but no one
6   would take the job that she wouldn't be
7   responsible for any delays?
8       A.   Say that again.
9       Q.   Yeah. Could you have that read back,
10  please?
11      A.   Ensure staffing levels are adequate for
12  daily operational needs and patient care.
13      Q.   Not you, the court reporter read back my
14  question.
15
16                  (Record read as
17                   requested.)
18
19              THE WITNESS:  I disagree.
20  BY MR. WATKISS:
21      Q.   Why is that? What is she supposed to do
22  to make people take those jobs?
23      A.   I don't know. That's not my job.
24      Q.   But you think that somehow she should be

103

1   able to magically make people fill those
2   positions, is that what you are telling me?
3       A.   Maybe not magically, but it's still her
4   responsibility. I am held accountable for my
5   actions or lack thereof.
6       Q.   Her responsibility as I understand your
7   testimony is to try to find people to fill those
8   positions, correct?
9       A.   Her job is also to ensure that the
10  medical staff that is there is doing their job
11  properly, not canceling on my sick call passes
12  and ignoring my grievances.
13      Q.   So, you think she would be responsible
14  for a sick call pass that would be canceled?
15      A.   I think that's exactly her
16  responsibility, is to make sure that her
17  healthcare staff is seeing people that need to be
18  seen. Not only were they not being triaged, but
19  I know they are not being triaged because every
20  day they would do all of 1 House, all of 2 House,
21  and when it was time to do 3 House, oh, time
22  constraints, ran out of time.
23      Q.   How do you know that?
24      A.   Because I lived there. I saw what was

104

1   happening.
2               MR. WATKISS:  Okay. Give me one
3   second here.
4               I don't have anything further.
5
6               REDIRECT EXAMINATION
7   BY MS. SYRCLE:
8       Q.   I just have a brief follow-up from that.
9            You don't have copies of any of the sick
10  call slips that you submitted, correct?
11      A.   You guys might have sent me copies of
12  them.
13      Q.   You think that there are copies of the
14  sick call requests?
15      A.   There might be. It was either from here
16  or Danville, but I have some of them, yeah, that
17  you guys sent me.
18      Q.   Are they with you there in front of you?
19      A.   No. I have a whole folder of stuff that
20  you guys sent me.
21      Q.   And you think it came from one of the
22  attorneys in this case?
23      A.   Yes.
24      Q.   Do you recall what were the dates on the

(26) Pages 101 - 104

105

1  slips that were produced in this case?
2      A.    Well, the dates that are in this
3  Complaint are spot on. I took good notes when
4  all of this was happening. So, whatever that
5  says, it's -- I will back it up.
6      Q.    And you have referenced sick call visits
7  being canceled due to time constraints?
8      A.    Correct.
9      Q.    If we look at the dates of those -- I'm
10  on page 5 of your Complaint. And I can show it
11  or we can just talk about it.
12          The records that you reference are
13  July 29th of 2021, correct?
14      A.    Yes.
15      Q.    Paragraph 26 of your Amended Complaint.
16      A.    Uh-huh.
17      Q.    August 3rd of 2021, not seen due to time
18  constraints, is that correct?
19      A.    Correct.
20      Q.    And then on August 5th you are seen,
21  right?
22      A.    Yes.
23      Q.    And you saw not just the nurse but also
24  Dr. Ek on the same day, correct?

106

1      A.    Correct.
2      Q.    So, the cancellations due to time
3  constraints account for the time from July 29 to
4  August 5th, correct?
5      A.    They account from July 15th when I
6  started asking to come over there.
7      Q.    You don't have any record of those sick
8  call slips, right, prior to the one for which you
9  were called over on July 29?
10      A.    I might.
11      Q.    Okay.
12      A.    I'll take a look. I mean, you guys
13  probably have them.
14      Q.    And you think -- okay. So, whatever you
15  have is what's been produced in discovery in this
16  case already, right?
17      A.    I think you produced it.
18      Q.    Me, on behalf of Wexford?
19      A.    Somebody. Somebody.
20      Q.    Wexford wouldn't have your sick call
21  slips.
22      A.    Then it was from Chicone.
23      Q.    Okay. So, but anything that you are
24  referring to there was produced by one of the

107

1  attorneys in this case, is that right?
2      A.    Yes. If -- I don't know this. If
3  Chicone discloses something to me, do I need to
4  disclose it to you to use as evidence?
5  BY MS. SYRCLE:
6      Q.    So, I mean we would -- when we produce
7  stuff to you, we produce it to each other too.
8  That is not your responsibility, no.
9      A.    Okay.
10      Q.    So, but I was just clarifying that it's
11  your testimony that whatever you have in terms of
12  sick call slips, copies of any sick call slips,
13  it's because you got them from one of the
14  attorneys in discovery?
15      A.    Right.
16          MS. SYRCLE:  Okay. I have no other
17  questions.
18          MR. WATKISS:  I don't have any
19  follow-up on that.
20          MS. SYRCLE:  So, Mr. Wood, I think
21  that concludes our deposition. And there is a
22  process where you have the option -- and maybe
23  you read about it in one of your books -- but you
24  have the option to read and sign or waive

108

1  signature for the deposition. And what that
2  means is that you would have the opportunity if
3  you want to reserve and you want to read and sign
4  you get to read the transcript. You don't get to
5  keep a copy unless you buy one. But you can read
6  it and identify things like typos. If it says --
7  if you said pass and it says pest, things like
8  that. It's not an opportunity to change your
9  testimony.
10          So, it's your choice. You can choose
11  to reserve signature and read and sign or you can
12  waive signature and trust that Miss McCreight has
13  taken things down accurately.
14          THE WITNESS:  I would like to buy a
15  copy.
16          MS. SYRCLE:  That would be between
17  you and the court reporter. That is a separate
18  issue as to whether or not you want to reserve
19  signature.
20          THE WITNESS:  I mean, I'll sign. I
21  mean, I believe that you did a good job.
22          MS. SYRCLE:  Do you want to waive
23  signature but then you want to buy a copy of the
24  transcript?

109

1            THE WITNESS:  Yeah.
2            MS. SYRCLE:  Okay.  The record will
3     reflect that he'll waive signature.  And we will
4     go off the record and I will let you two talk
5     about purchase of the transcript.
6            I would like to order it typed up.
7            MR. WATKISS:  I'll take a copy as
8     well.
9
10           WITNESS FURTHER SAYETH NOT;
11           BY AGREEMENT, SIGNATURE WAIVED.
12
13
14
15
16
17
18
19
20
21
22
23
24

110

1                 CERTIFICATE OF REPORTER
2
3            I, LORRAINE McCREIGHT, an Illinois
4     Certified Shorthand Reporter, do hereby certify
5     that the witness whose testimony appears in the
6     foregoing deposition transcript was duly sworn
7     by me; that the testimony of said witness was
8     taken by me to the best of my ability, and
9     thereafter reduced to typewriting under my
10    direction; that I am neither counsel for, nor
11    related to, nor employed by any of the parties
12    to the action in which this deposition was
13    taken; and further, that I am not a relative or
14    employee of any attorney or counsel employed by
15    the parties hereto; nor financially or
16    otherwise interested in the outcome of this
17    action.
18
19        /s/ Lorraine K. McCreight
20    _____C.S.R
21           LORRAINE K. McCREIGHT
              C.S.R. License Number 084-003070
22
23
24

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS


Lucas Wood

 V.          21-CV-2254

Jonathan Ek et al,


PLAINTIFF'S RESPONSE TO DEFENDANTS
THIRD MOTION FOR EXTENTION OF TIME

 NOW COMES plaintiff Lucas Wood, pro se, and moves this court to DENY defendants motion for extention of time. In support of plaintiff says:

 1. The dispositive motions deadline set by this court was September 9,2024.

 2. This court has yet to rule on the previous motions for extention of time filed by defendants.

 3. Defendants have delayed this case by months. Defendants claim it is due to unheard motions, and phone call recordings, yet they used the recordings in a motion for sanctions, but have yet to file summary judgement motions.

 4. Plaintiff feels defendants request is not in good faith, and are simply stalling.

 5. The delay in motions being ruled on in this case has caused plaintiff a lot of confusion. Plaintiff is pro se and is unsure why this court has not ruled on previous motions.

 6. Trial in this case is set for February 2025.

 WHEREFORE, for the reasons stated above, This court should DENY defendants motion for extention of time and proceed to trial in February.

1of2

Respectfully submitted,

11-13-24

Lucas Wood R64297
251 N Il HWY 37
Ina,IL.62846

2of2