E-FILED
Tuesday, 16 September, 2025  12:25:48 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| **LUCAS WOOD,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-2254** |
| | ) | |
| **JONATHAN EK,** *et al.***,** | ) | |
| **Defendants.** | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Plaintiff proceeds under 42 U.S.C. § 1983 on a claim of deliberate indifference to a serious medical need in violation of the Eighth Amendment, a related *Monell*[1] claim, and an Illinois state law medical malpractice claim. Before the Court is Defendants' Motion for Summary Judgment (Doc. 179). For the following reasons, the motion is granted.

## I.    MATERIAL FACTS

The following facts are taken from the statement of undisputed material facts in Defendants' motion (Doc. 179, at 3-19 ¶¶ 1-155) and Plaintiff's response (Doc. 183, at 1-21) thereto, as well as the additional material facts section in Plaintiff's response (Doc. 183) and Defendant's reply (Doc. 187).

To the extent any facts are in dispute, the Court has reviewed each party's position on those facts and consulted the record. If a fact is incompatible with the record, the Court has stated the fact as it appears in the record. If a fact is fairly in dispute even after

---

[1] *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

reviewing the record, the Court has also provided the parties' positions on the disputed fact.

### A. The Parties

At all relevant times, Plaintiff Lucas Wood was an inmate in the Illinois Department of Corrections ("IDOC") at Danville Correctional Center ("Danville"). Defendant Jonathan Ek is a medical doctor licensed to practice in the State of Illinois. Defendant Elicia Pearson is a licensed practical nurse ("LPN") who worked at Danville during the relevant time.

### B. History of Plaintiff's Medical Care

Upon Plaintiff's transfer to Danville on March 31, 2021, he was placed in a chronic care clinic due to his reported history of seizures. Chronic care clinics at Danville are a means by which patients are automatically scheduled for regular, periodic medical visits for assessment and monitoring of certain chronic conditions. On March 31, 2021, Defendant Ek issued Plaintiff an indefinite low bunk permit based upon his report of a history of seizures. A low bunk permit is a medical permit to ensure an inmate is given a housing assignment that does not require him to climb onto a top bunk.

Plaintiff saw nurses on April 3, 7, 11, and 17, 2021, for complaints of indigestion and heartburn. The nurses gave Plaintiff antacids and referred him to see Defendant Ek. On April 20, 2021, Plaintiff saw Defendant Ek for complaints of heartburn. Plaintiff reported a history of gastroesophageal disease ("GERD"), and Defendant Ek prescribed Prilosec to address Plaintiff's complaints.

On May 10, 2021, Defendant Ek saw Plaintiff in chronic care clinic for his seizures. At that visit, Plaintiff reported a history of seizures as a child, for which he was on medication. Plaintiff also reported he stopped the anti-seizure medication in 2014 and had no gran mal seizures in 10 years. At the visit, Defendant Ek noted Plaintiff's blood pressure was high and ordered labs, a low dose of Lisinopril to treat Plaintiff's hypertension, and for Plaintiff to be added to the hypertension clinic for ongoing monitoring.

On June 4, 2021, a correctional lieutenant sent Plaintiff to the Danville healthcare unit to be seen for an abscess on his wrist. The nonparty nurse practitioner cleaned and bandaged the abscess and prescribed an antibiotic for any infection. Plaintiff returned to the healthcare unit the next day with complaints that the abscess on his wrist had worsened overnight. Plaintiff saw a nurse on June 5, which was a Saturday. Defendant Ek did not work at Danville on Saturdays but was available by phone. The nurse called Defendant Ek, who ordered Plaintiff to be sent to an emergency department at a nearby hospital for evaluation. The outside hospital diagnosed Plaintiff with MRSA cellulitis, a deep skin infection, and performed incision and drainage. Plaintiff remained at the hospital until the evening of June 8, 2021.

Plaintiff was scheduled to see Defendant Ek during the morning of June 9, 2021. Defendant Ek admitted Plaintiff to the infirmary at Danville and ordered he be checked daily by nurses. Defendant Ek also ordered a call to the hospital for wound care instructions, continued antibiotics, and follow-up with the outside surgeon. Plaintiff remained in the infirmary, where he was monitored by Defendant Ek and nursing staff

until June 23, 2021. Plaintiff was discharged from the infirmary after a follow-up visit with the outside surgeon. During the discharge, Defendant Ek ordered continued dressing changes until the wound was fully healed and scheduled a follow-up with Plaintiff in two weeks.

Defendant Ek also directed a Wellness Program at Danville for individuals with chronic conditions including diabetes, hypertension, and obesity. The Wellness Program involved meeting three times per week for structured exercises. Plaintiff attended the new session of the Wellness Program began on July 12, 2021.

### C. Plaintiff's Injury

On July 11, 2021, Plaintiff injured his right ankle while playing soccer. Because July 11 was a Sunday, Defendant Ek was not onsite at Danville. However, Defendant Ek was available by phone.

Defendant Ek attests that when an inmate at Danville suffers a serious, acute injury or otherwise has a medical emergency, he can request that staff call a Code 3, which initiates a call to medical staff to report to the individual's location to assess him. A Code 3 was not called for Plaintiff.

Plaintiff testified in his deposition that with the assistance of two other inmates, he approached the nonparty correctional officer who was supervising inmates as they returned from the recreation yard. Plaintiff asked the officer if he could have Plaintiff called to the healthcare unit. Plaintiff testified that the officer told him no and directed him to sign up for nurse sick call. Plaintiff returned to his housing unit by walking with

the two other inmates, testifying that he "us[ed] them as crutches" and did not put any weight on the injured ankle.

On July 12, 2021, Defendant Ek saw Plaintiff at the Danville gym for orientation of a new session of the Wellness Program. Defendant Ek attests that he saw Plaintiff exercising in the orientation session. Plaintiff did not complain to Defendant Ek about his ankle during the session. Plaintiff attests that Defendant Ek had told the group not to ask about medical concerns.

Danville inmates can submit a request to be seen by a nurse for non-emergency medical concerns. The nurse sick call process is established by IDOC. The request slips are processed by staff and the individual is scheduled to see a nurse. Defendant Ek is not involved in the nurse sick call process.

Plaintiff did not put in a nurse sick call request on the day of the injury. Plaintiff testified that he submitted a nurse sick call request slip four days later, on July 15, 2021. There is no record of when or if the healthcare unit received Plaintiff's July 15 sick call request.

Plaintiff was called to the healthcare unit on July 21, 2021, for a tuberculosis test. IDOC directives require every inmate to be tested for tuberculosis ("TB") annually. The process for administering and reading TB tests is distinct from nurse sick call. On days when Defendant Pearson was assigned to administer the TB tests, she would be assigned a list of individuals due for the test. In July 2021, individuals from a given housing unit were identified as due for a TB test, and those individuals would walk to the healthcare unit and be placed in a line for the test.

Defendant Pearson administered Plaintiff's TB test on July 21, 2021. On July 21, 2021, Defendant Pearson would have been aware that Plaintiff had just walked to the healthcare unit from his housing unit. Plaintiff testified that on that day there was a "whole group" of inmates getting TB tests, that Defendant Pearson met them at the doorway, and that they did not go all the way into the healthcare unit. This is consistent with Defendant Pearson's attestation that she had a line of individuals waiting for their tests.

Plaintiff testified that when he went up for his TB test, he told Defendant Pearson: "[M]y foot is really messed up. Like you can see it's purple and I can't put a shoe on.[2] She said sign up for nurse sick call. I said I did sign up for nurse sick call. She said you will be seen soon then. We are short staffed." Plaintiff did not submit a sick call request on July 21, 2021. Plaintiff had an outside friend or relative, Elizabeth Lampson, call the healthcare unit on that day.

After a tuberculosis test is administered, it is typically read within 48 to 72 hours. In July 2021, a nurse would go to an individual's housing unit to read the TB test by measuring any raised area in the skin at the injection site. Plaintiff claims Defendant Pearson was the nurse who read his TB test in July 2021 and that she again advised him to sign up for nurse sick call.

Plaintiff submitted a second nurse sick call request on July 23, 2021. According to Plaintiff's medical records, he was scheduled to be seen at nurse sick call on July 29 and

---

[2] Plaintiff attests that he was wearing a shower shoe on that day.

August 3, 2021. Plaintiff's medical records document that he was not seen on those dates due to "time constraint[s]."

On August 5, 2021, Plaintiff saw a nonparty nurse for nurse sick call. The nurse completed an assessment, noting mild pitting edema (swelling caused by excess fluid build-up) and a greenish-yellow discoloration, good range of motion, no broken skin, and normal assessments for pulse and circulatory integrity. The nurse discussed Plaintiff's condition with Defendant Ek, and Defendant Ek saw Plaintiff that same day.

During Defendant Ek's examination of Plaintiff on August 5, 2021, Defendant noted mild edema (swelling) and slight ecchymosis (bruising) on the right Achilles. Defendant Ek also recalled that he had seen Plaintiff exercising in the time since the injury.[3]

When assessing an Achilles injury, Defendant Ek palpates the tendon to check for a gap that is often palpable if the tendon is torn. Defendant Ek attests that individuals with a ruptured Achilles tendon also typically have a decreased range of motion in the ankle joint. When he assessed Plaintiff on August 5, 2021, Defendant Ek noticed no palpable gap and noted Plaintiff's range of motion was good. Plaintiff maintains that he could feel a gap in his own heel. When Defendant Ek squeezed Plaintiff's calf, Plaintiff demonstrated flexion of the foot, which further decreased the likelihood of an Achilles tendon rupture. Based on Defendant Ek's physical assessment and observation of

---

[3] Plaintiff notes that he may have done exercises following the injury but would have been cautious. He asserts that he could still do pushups, crunches, and planks, and that he limped or hobbled while walking or running.

Plaintiff's physical activities since his injury, Defendant Ek assessed Plaintiff with an Achilles contusion. To confirm his diagnosis, Defendant Ek ordered an ultrasound of Plaintiff's right ankle. He also referred Plaintiff to physical therapy for an Achilles contusion and prescribed naproxen and acetaminophen as needed for pain.

On August 16, 2021, Plaintiff was again called to nurse sick call but declined an examination as he was awaiting physical therapy and the ultrasound. Plaintiff received the ultrasound of his Achilles on August 31, 2021, and the results arrived at Danville on September 3, 2021, showing a tear in Plaintiff's right Achilles.

Upon receipt of the results, the medical records staff notified a nonparty nurse practitioner. The nurse practitioner had Plaintiff brought to the healthcare unit and admitted to the infirmary. The nurse practitioner examined Plaintiff and noted mild edema, sensation present, no erythema (redness), and pulses within normal limits. According to the nurse practitioner's notes, Plaintiff was able to move the digits on his right foot without difficulty. The nurse practitioner ordered crutches and a splint, prescribed ibuprofen for pain, ordered Plaintiff to be non-weight bearing on his right lower extremity, and referred Plaintiff to an orthopedic specialist.

While in the infirmary, Plaintiff was regularly assessed by nursing staff and could always request assistance from nurses, if needed. Defendant Ek saw Plaintiff in the infirmary on September 7, 2021, and noted Plaintiff was in no apparent distress and his orthopedic referral had been made. On that day, Defendant Ek authorized Plaintiff to have a wheelchair in addition to the crutches authorized by the nurse practitioner.

Defendant Ek saw Plaintiff in the infirmary again on September 9, 2021. Plaintiff reported he was staying non-weight bearing, and Defendant Ek ordered continued ibuprofen and acetaminophen as needed for pain. Defendant Ek noted Plaintiff's pending orthopedic referral.

On September 15, 2021, Defendant Ek again saw Plaintiff in the infirmary. He noted Plaintiff was using a wheelchair and was not in any apparent distress. That same day, Defendant Ek made a note for the medical records staff to confirm the orthopedic appointment had been scheduled. When inmates at Danville are referred to an outside specialist, the scheduling of the appointment is based on the availability of the specialist and is outside of Defendants' control. As with patients in the community, Danville inmates may have to wait some time for appointments with specialists.

On September 23, 2021, Defendant Ek again saw Plaintiff in the infirmary. Defendant Ek noted Plaintiff's splint was in place, Plaintiff reported no changes, and he was in no apparent distress. Defendant Ek ordered continued non-weight bearing on Plaintiff's right foot and noted the orthopedic referral was scheduled for the next day. Plaintiff maintains that he talked with Defendant Ek more than once about his pain not being effectively managed by the prescribed medicine.

Plaintiff saw the orthopedist on September 24, 2021. The orthopedist gave Plaintiff a weight bearing boot and requested an MRI. On September 27, 2021, Plaintiff saw Defendant Ek in the infirmary and discussed the orthopedist's recommendations. Defendant Ek's plan was to refer Plaintiff for the MRI, per the orthopedist's recommendation, and to have a subsequent follow-up with the orthopedist.

According to Plaintiff's medical records, the MRI was completed on October 6, 2021 and Defendant Ek saw Plaintiff on October 7, 2021. At the time, Plaintiff's follow-up appointment with the orthopedist was scheduled for October 15, 2021.

On October 13, 2021, a nurse documented Plaintiff ambulating without the boot. On October 14, 2021, Defendant Ek saw Plaintiff in the infirmary. Plaintiff complained that the ibuprofen was not working well, and Defendant Ek ordered a change to naproxen with acetaminophen and instructed Plaintiff to wear the boot for all weight-bearing activities.

Plaintiff saw outside provider Dr. Maker at Carle Physician Group on October 15, 2021. Dr. Maker noted he discussed both conservative and surgical options with Plaintiff but that Plaintiff expressed a preference for surgical intervention.

On October 18, 2021, Defendant Ek saw Plaintiff following his return from the visit with Dr. Maker. Defendant Ek noted it was determined Plaintiff would receive a tendon repair. Defendant ordered Robaxin (a muscle relaxer) 750 mg per day for 14 days, potassium chloride (to address complaints of cramping pain in his foot) for 14 days, Loratadine (Claritin) as needed for 3 months, and Lexapro (to treat anxiety) for 30 days.

Outside elective surgical procedures, such as Plaintiff's tendon repair surgery, are scheduled based upon the availability of the surgeon. Defendant Ek has no control on when a surgery is scheduled after making the referral. While Plaintiff was awaiting surgery, Defendant Ek continued to monitor his condition in the infirmary on a regular basis. When Plaintiff complained of nighttime cramps or pain, Defendant Ek again

prescribed Robaxin and later a muscle rub. When Plaintiff complained that he strained his back, Defendant Ek prescribed Toradol (a pain killer) and Robaxin.

On January 26, 2022, the surgical repair of Plaintiff's right Achilles was completed at Carle Hospital. Defendant Ek saw Plaintiff upon his return to Danville following the surgery. Defendant Ek continued Plaintiff's prescriptions for Aspirin, naproxen, and Tylenol, as needed, and prescribed Norco 5 mg and Robaxin 700 mg for 7 days. Defendant Ek also submitted the follow-up appointment with Plaintiff's surgeon on February 10, 2022.

Defendant Ek assessed Plaintiff on February 2, 2022, and noted that, although Plaintiff complained of pain at the surgical site, he had good perfusion (circulation) of the toes on his right foot. To address Plaintiff's complaints of continued pain, Defendant Ek extended his Norco prescription for an additional 12 days, with step down dosage.

Defendant Ek saw Plaintiff upon his return from a follow-up appointment with his surgeon on February 10, 2022. Defendant Ek noted Plaintiff's sutures had been removed and a hard cast put in place on his right lower extremity. Defendant Ek noted Plaintiff continued to have good perfusion of toes. Defendant Ek's plan of care included another surgical follow-up appointment in four weeks and use of a boot with a wedge, which were consistent with the surgeon's recommendations.

Plaintiff remained in the infirmary pending the final surgical follow-up, and Defendant Ek continued to monitor his progress. Plaintiff had another follow-up visit with Dr. Maker on March 11, 2022 where he documented Plaintiff's incision site was healed. Dr. Maker also noted: "negative edema. No pain palpation of posterior calf.

Achilles tendon intact. Patient is able to plantar flex against resistance." Dr. Maker's findings were indicative of a successful surgery and appropriate healing. Dr. Maker ordered Plaintiff be placed into a tall CAM boot, with three layered heel lifts, one lift to be removed every seven days. Dr. Maker noted Plaintiff was allowed to begin weight bearing activities and start therapy.

Defendant Ek saw Plaintiff on March 17, 2022, and based on Dr. Maker's notes, discharged Plaintiff from the infirmary. Plaintiff also believed at that time he was healthy enough to leave the infirmary and requested that he be discharged. On March 17, Defendant Ek discussed Plaintiff's placement with the assistant warden and obtained approval to discharge him to a housing unit used as an infirmary step-down unit. Defendant Ek ordered low bunk, low gallery, slow walk, and slow eat permits for Plaintiff. Defendant Ek also ordered continued prescriptions for pain medication, Prilosec, Lisinopril 10 and Claritin. Defendant Ek ordered Plaintiff to continue with the walking boot as directed by his orthopedic surgeon and referred Plaintiff for orthopedic follow-up and physical therapy.

Defendant Ek has no control over how quickly an outside physical therapist will see a patient after he has made a referral. According to the records, Plaintiff was evaluated by a physical therapist at Carle Therapy Services on April 12, 2022, and provided a home exercise program to be done daily. Plaintiff completed the course of physical therapy on June 13, 2022, and was to continue with his home exercise program to continue strengthening his ankle post-surgery.

III.    **ANALYSIS**

**A. Legal Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). "If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015).

"When opposing a properly supported motion for summary judgment, the non-moving party must 'cit[e] to particular parts of materials in the record' or 'show[] that the materials cited do not establish the absence … of a genuine dispute.'" *Melton v. Tippecanoe County*, 838 F.3d 814, 818 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(c)). All facts must be construed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A scintilla of evidence supporting the nonmovant's position cannot defeat a

motion for summary judgment; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id*. at 252.

### B. Eighth Amendment

The Constitution mandates adequate medical care for inmates. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976). "The Eighth Amendment proscribes deliberate indifference to serious medical needs of prisoners amounting to the unnecessary and wanton infliction of pain." *Arce v. Wexford Health Sources Inc.*, 75 F.4th 673, 678–79 (7th Cir. 2023) (internal quotation marks omitted). To prevail on such a claim, a plaintiff must prove: (1) the risk to the inmate is objectively serious, *Farmer v. Brennan*, 511 U.S. 825, 834 (1994), and (2) the defendant official's state of mind is one of deliberate indifference to the inmate's health or safety. *Id.*; *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Deliberate indifference" means an official "knows of and disregards an excessive risk to an inmate's health or safety." *Farmer*, 511 U.S. at 837.

### C. Application to this Case

Taking the record most favorably to Plaintiff as the nonmovant, Plaintiff suffered an objectively serious medical need when he injured his right ankle on July 11, 2021. *See Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000) (medical condition is objectively serious if "the failure to treat it could result in further significant injury or the unnecessary and wanton infliction of pain") (internal quotations omitted). Defendants do not argue otherwise.

However, Defendants Ek and Pearson are entitled to summary judgment because the record demonstrates that they were not deliberately indifferent to Plaintiff's medical

needs. Inadequate medical treatment due to negligence or even gross negligence does not support an Eighth Amendment violation. *Shockley v. Jones*, 823 F.2d 1068, 1072 (7th Cir. 1987). Rather, "[n]eglect of a prisoner's health becomes a violation of the Eighth Amendment … "only if [the defendant] 'knows of and disregards an excessive risk to inmate health or safety.'" *Sellers v. Henman*, 41 F.3d 1100, 1102 (7th Cir. 1994), *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To establish deliberate indifference, a plaintiff must show "'something approaching a total unconcern for his welfare in the face of serious risks.'" *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006), *quoting Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992).

Viewing the record in the light most favorable to Plaintiff, he could walk only with assistance from other inmates in the immediate aftermath of his injury on July 11, 2021. A reasonable jury could conclude that the presentation of Plaintiff's symptoms on that date should have prompted the use of a Code 3 for immediate medical care to diagnose and treat an acute injury. However, the correctional officer whom Plaintiff approached on July 11 is not a party in this suit, and Defendant medical providers cannot be held deliberately indifferent to a risk about which they had no subjective knowledge on that date.

Plaintiff first submitted a request to be seen at nurse sick call four days later, on July 15, 2021. There is no record that this request was received in the healthcare unit, nor that Defendants had any knowledge of this request. Again, Defendants cannot be held liable if they had no knowledge of Plaintiff's need for care.

Plaintiff first spoke with Defendant Pearson ten days post-injury, on July 21, 2021. Based upon the undisputed record, Plaintiff was one of a "whole group" of inmates who saw Defendant Pearson that day for the sole purpose of administering TB tests. District Courts within this Circuit have regularly held that a nurse cannot be expected to address non-emergency medical needs while the nurse is simultaneously tasked with efficiently addressing the needs of a large number of other inmates:

> [T]he undisputed evidence before the Court is Plaintiff chose to speak to each of the Defendants when they were in the process of handing out medications. A job which requires staff to move promptly to ensure that appropriate medications are given to the appropriate inmates in a timely manner…. Courts have repeatedly held medical providers are not deliberately indifferent when they continue the job of dispensing medications rather than address individual inmate's sick call requests.

*Titus v. Melvin*, Case No. 18-cv-1094, Doc. 142 (C.D. Ill. March 26, 2021) (collecting cases).

Plaintiff suggests Defendant Pearson must have been subjectively aware that his ankle required urgent treatment on July 21. However, the undisputed record establishes Defendant Pearson observed Plaintiff only briefly, during the administration of TB tests to a large group of inmates, and with the knowledge that Plaintiff had independently walked himself to the healthcare unit for the test. Further, according to Plaintiff's testimony, Defendant Pearson confirmed with Plaintiff that he had signed up for nurse sick call and therefore told him that he would be seen soon.

Again, negligence or even gross negligence is insufficient to establish an Eighth Amendment deliberate indifference claim. *Shockley*, 823 at 1072. "'[D]eliberate indifference' (in this circuit) is merely a synonym for intentional or criminally reckless conduct[.]" *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991).  Based upon the

record, a reasonable jury could not conclude Defendant Pearson was intentionally or criminally reckless where she confirmed with Plaintiff that he had signed up for sick call for his injury and did not herself halt TB test administration in order to verify that his request was received or to begin assessment and treatment of Plaintiff's ankle on the spot. *See, e.g., McNeal v. Redman*, 21 F.Supp.2d 884, 887 (C.D. Ill. 1998) ("The plaintiff had no constitutional right to see a doctor on demand…), *citing Hudson v. McMillian*, 503 U.S. 1, 9 (1992) ("Society does not expect that prisoners will have unqualified access to health care."); *Peterson v. Meisner*, 2017 WL 5054729, at *12 (W.D. Wis. Nov. 2, 2017) ("The Eighth Amendment does not a give a prisoner a right to treatment on demand. If prison medical staff had a constitutional duty to drop everything whenever a prisoner asked for nonemergency treatment, it is likely that they would not be able to provide effective care for any prisoner.")

Further, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996). Plaintiff has not pointed to any verifying medical evidence in the record to establish that a delay due to Defendant Pearson declining to admit him to the healthcare unit for immediate treatment on July 21, 2021, exacerbated or worsened his condition or the effectiveness of the ultimate surgical treatment. For these reasons, Defendant Pearson is entitled to summary judgment in her favor on Plaintiff's Eighth Amendment claim of deliberate indifference.

Turning to Plaintiff's deliberate indifference claim against Defendant Ek, the undisputed record establishes Defendant Ek was not aware of Plaintiff's injury until August 5, 2021. A nurse notified Defendant Ek of Plaintiff's condition on August 5, and Defendant saw Plaintiff that same day.

On that date, Defendant Ek conducted an examination based upon his professional training in the assessment of Achilles injuries. Based upon the symptoms he observed during the examination, and the undisputed fact that Plaintiff had been continuing with various forms of exercise since the injury in July, Defendant Ek diagnosed Plaintiff with an Achilles contusion, rather than a rupture. However, Defendant Ek further referred Plaintiff for an ultrasound to confirm the diagnosis. He also prescribed medication, as needed, for pain.

Defendant Ek's initial misdiagnosis of an Achilles contusion, rather than an Achilles rupture, cannot form the basis of a deliberate indifference claim where Plaintiff has presented no competent evidence that Defendant failed to exercise professional judgment in forming that diagnosis. *See Sanville v. McCaughtry*, 266 F.3d 724, 736 (7th Cir. 2001) ("physicians do not practice with a crystal ball"); *Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) (summary judgment appropriate even if "hindsight" revealed that doctor's treatment decision was ultimately incorrect).

"A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain*, 512 F.3d 886, 894-95 (7th Cir. 2008), *quoting Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). A medical professional may only be held to have

displayed deliberate indifference if their decisions are such a departure from established practice and judgment as to demonstrate "a complete abandonment of medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006).

To assess whether a medical professional was deliberately indifferent, the Court must look at the totality of the care provided to Plaintiff, assessing "the *entire* record" of care provided. *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 591 (7th Cir. 1999) (emphasis in original). Plaintiff's medical records plainly indicate Defendant Ek was responsive to Plaintiff's medical concerns and requests, ordering testing to confirm the initial diagnosis, confirming an orthopedic specialist referral after receiving the diagnosis of a rupture, monitoring Plaintiff while he awaited the outside appointment, prescribing pain medication in varying forms and doses as needed, and closely and promptly following the orthopedist's recommendations as well as Plaintiff's expressed preference for surgery over more conservative treatment options.

In sum, even viewing the record in the light most favorable to Plaintiff, no reasonable jury could conclude that the foregoing, extensive care provided by Defendant Ek from August 2021 through Plaintiff's requested discharge from the infirmary in March 2022 evinced deliberate indifference. Therefore, Defendant Ek is likewise entitled to summary judgment in his favor on Plaintiff's Eighth Amendment deliberate indifference claim.

### D. *Monell* Claim

The Court next turns to Plaintiff's *Monell* claim against Defendant Wexford, which employed both Defendants Ek and Pearson. Under § 1983, a municipality or corporation

may be held liable for a constitutional violation due to an official policy (or lack thereof), a widespread practice or custom, or acts of an official who has final policy-making authority. *Monell*, 436 U.S. at 690; *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 n.6 (7th Cir. 2002) ("For purposes of § 1983, we have treated a private corporation acting under color of state law as though it were a municipal entity."). The doctrine of *respondeat superior* does not apply to actions filed under 42 U.S.C. § 1983. *Smith v. Gomez*, 550 F.3d 613, 616 (7th Cir. 2008) (supervisor liability not permitted under § 1983).

Thus, for Plaintiff's *Monell* claim to survive summary judgment, he must have evidence of: "(1) an action pursuant to a municipal policy, [practice or custom,] (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020).

Viewing the record in the light most favorable to Plaintiff, Defendant Pearson told him on July 21, 2021, that the healthcare unit was "short staffed." The record establishes that Plaintiff's first nurse sick call appointment for his ankle was delayed from July 29 to August 5, 2021, due to documented "time constraints."

However, Plaintiff has presented no evidence of a policy, practice, or custom by Wexford that actually caused any constitutional injury. Alleged "short staff[ing]" or "time constraints" during a during a 15-day period from July 21 to August 5, 2021, is insufficient for Plaintiff to demonstrate Wexford had a policy, practice, or custom of accepting such staffing issues. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) ("[A]

court's favor toward the nonmoving party does not extend to drawing inferences that are only supported by speculation or conjecture.").

More generally, the record of Plaintiff's treatment as a whole—both for the ankle injury at issue in this case, and for other conditions such as diabetes, hypertension, GERD, and MRSA—cannot support an inference that Wexford was in the practice of delaying or denying care. Finally, as discussed above, any delay due to Wexford staffing issues only rises to a constitutional violation if Plaintiff has verifying medical evidence regarding the effect of that delay. *See Langston*, 100 F.3d at 1240. Again, Plaintiff has not submitted any such evidence. For these reasons, Defendant Wexford is entitled to summary judgment in its favor on Plaintiff's *Monell* claim.

### E. Medical Malpractice Claim

Finally, Defendants Ek and Pearson are also entitled to summary judgment in their favor on Plaintiff's Illinois state law medical malpractice claim.

The Seventh Circuit has held that defendants are entitled to summary judgment on medical malpractice claims if a plaintiff fails to comply with the Illinois Healing Arts Malpractice Act. *Young v. United States*, 942 F.3d 349, 352 (7th Cir. 2019). That Act requires Plaintiff file an affidavit attesting that a qualified medical provider has found the malpractice claim to be meritorious (or otherwise falling within a statutory exception). 735 Ill. Comp. Stat. 5/2-622(a). Plaintiff has not done so, and summary judgment must enter against him.

**IT IS THEREFORE ORDERED:**

1)    **Defendants' Motion for Summary Judgment [179] is GRANTED. Judgment shall enter in favor of Defendants and against Plaintiff.**

2)    **If Plaintiff wishes to appeal this judgment, he must file a notice of appeal with this Court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal in forma pauperis MUST identify the issues Plaintiff wishes to present on appeal, to assist the Court in determining whether the appeal is taken in good faith. *See* Fed. R. App. P. 24(a)(1)(c); *see also Celske v Edwards*, 164 F.3d 396, 398 (7th Cir. 1999) (an appellant should be given an opportunity to submit a statement of his grounds for appealing so that the district judge "can make a reasonable assessment of the issue of good faith."); *Walker v. O'Brien*, 216 F.3d 626, 632 (7th Cir. 2000) (providing that a good faith appeal is an appeal that "a reasonable person could suppose…has some merit" from a legal perspective). If Plaintiff does choose to appeal, he will be liable for the $605.00 appellate filing fee regardless of the outcome of the appeal. If the Court allows him to proceed on appeal in forma pauperis that finding would allow Plaintiff to pay the appellate filing fee over time but would not release him from having to pay the fee.**

3)    **This case is hereby terminated.**

ENTERED September 16, 2025.


s/ *Colleen R. Lawless*
_____
COLLEEN R. LAWLESS
UNITED STATES DISTRICT JUDGE